MARY E. SCOTT, Appellee, v. THE HOMESTEADERS, Appellants.

**Expert evidence:** EXPERIMENTS: ADMISSIBILITY. Where the defendant in an action upon a certificate of insurance, in support of an issue of suicide by shooting, offered evidence to show that no pow-

der marks appeared about the wound, and contended that when the muzzle of a revolver is held close to the body so as to prevent communication with the atmosphere no powder marks will appear on the outside of the wound, and in support of such theory offered an expert witness who testified to that effect, basing his evidence upon observation and experience with such weapons regardless of their caliber, the evidence of an expert, called by the adverse party, based upon experiment with a revolver of certain caliber was properly admitted on rebuttal in contradiction of defendant's theory.

**Same.** The admission of expert evidence based upon experiment is largely a matter of discretion, and the ruling of the trial court will not be disturbed unless this discretion has been abused. In this action the court permitted plaintiff to introduce evidence of an experiment by firing a revolver pressed against bacon skin supported by a cabbage head, for the purpose of rebutting defendant's theory that if the weapon is held close to the person powder marks will not appear upon the surface of the skin around the wound, and it is held that there was not such an essential difference in conditions as to render the evidence inadmissible; especially as the witness brought the materials used into court.

**Fraternal insurance:** SUICIDE: CIRCUMSTANTIAL EVIDENCE: INSTRUCTIONS. Where the evidence in support of death by suicide, in an action on a certificate of life insurance, is wholly circumstantial, an instruction that to warrant a finding of suicide the circumstances must point "clearly" to the fact of suicide and be inconsistent with any other reasonable hypothesis, merely requires that the circumstances clearly point to suicide and not that the fact of suicide be clearly proven; and this is especially true when considered in connection with another instruction to the effect that the burden is upon the party claiming suicide to prove the same by the greater weight of evidence.

**Same:** MISLEADING INSTRUCTIONS. An instruction that the burden is upon the insurer claiming suicide to "satisfy" the jury by the preponderance of evidence that the wound causing death was self-inflicted is held not to have been misleading because of the use of the word satisfy, when qualified as in this case by the rule relating to preponderance of evidence.

**Same:** SUICIDE: INSTRUCTIONS. Where as in this case the evidence was such that proof of suicide, the burden of which was upon the insurer, necessarily negatived the hypothesis either of murder or accident, an instruction that if after considering all of the evidence the jury was unable to say by whom or how the wound causing death was inflicted then their verdict should be for the plaintiff, was not objectionable as casting upon defendant the bur-

den of proving that deceased was not murdered and that his death was not caused by accident. Nor was the instruction confusing because permitting the jury to say, within themselves, that they did not know just how or by whom the wound was inflicted, although the circumstances indicated suicide.
Deemer, C. J., dissenting.

*Appeal from Wapello District Court.*—Hon. M. A. Roberts, Judge.

Thursday, December 15, 1910.

Action at law to recover a death benefit on a certificate of membership in a fraternal beneficiary association. The defense was that the deceased came to his death by means of suicide. Verdict and judgment for the plaintiff. Defendant appeals.—*Affirmed.*

*Frank H. Dewey* and *Tisdale & Heindel,* for appellant.

*Smith & Lewis,* for appellee.

Evans, J.—The plaintiff is the widow of B. W. Scott, and is the beneficiary named in a certificate of membership and insurance held by the said Scott in his lifetime in the defendant as a fraternal beneficiary association. One of the provisions of such certificate is that it shall be void if the holder thereof die by his own hand, except by accident. The certificate was issued on January 9, 1906. On January 20, 1907, Scott died from a gunshot wound. The immediate circumstances of his death are involved in much uncertainty. Circumstantial evidence alone is relied on by both parties; the burden of proof being upon the defendant to prove its defense of an alleged suicide.

This is a companion case to *Mary E. Scott v. Sovereign Camp of the Woodmen of the World,* 149 Iowa, 562. The

two cases are based upon similar policies upon the life of said B. W. Scott, and in favor of the plaintiff as the beneficiary in each. The cases were tried separately, but upon substantially the same evidence, and substantially the same questions are presented in both cases here. In our opinion already filed in the first case, we have passed upon all the questions presented on this appeal except two which we are about to note. Without repeating the discussion already had in the former case, we will confine our attention to the two alleged errors which differentiate the record in this case from that in the other.

I. In the rebuttal testimony on behalf of plaintiff, the following record is presented to us by appellant's abstract:

Q. There has been some theorizing by eminent physicians about the effect of holding a pistol in contact with the skin and discharging it, and some gentlemen, chiefly Mr. Heindel, have advanced the theory that if held in contact, it would leave no burning or mark, and will ask you if, at my request, you have made an experiment with a piece of hog meat placed upon a cabbage head? A. Yes, I have made some tests. This head of cabbage was placed against the wall, and the pistol, a 22-caliber, was pressed hard in on the head of the cabbage; pressed against the skin on the piece of bacon. By Mr. Heindel: We object to this testimony as incompetent and immaterial, and because it appears from what has been said by witness the pistol is a different caliber, and the witness acknowledges this test as made in a different way in which Mr. Scott's was fired. Overruled. Excepted. A. Well, this pistol, as I said, was fired with the muzzle pressed tight against the piece of bacon; here is the powder marks in burning the powder; there was a good deal more of it than there is now; some of it has been rubbed off. Now the hole went through this head of cabbage, pressed right up against the bacon, and the bacon is black where the bullet entered, and a little black on the cabbage, showing that combustion came out on this side, and not on this.

*1. Expert Evidence: experiments: admissibility.*

It is now argued that the objection above noted should have been sustained, and that evidence of the alleged experiment should not have been permitted because (a) it was made with a 22-caliber pistol, whereas the pistol found near the dead body of Scott was of a larger caliber; and because (b) a bacon skin supported by a cabbage head did not present sufficient similarity of condition to render evidence of the experiment admissible. The rule contended for by appellant is, that evidence of experiments is admissible only when the experiment is shown to have been made under essentially the same conditions. This rule may be conceded for the purpose of this discussion, although it falls somewhat short of reaching the real question presented to us by this record. But this is an abstract rule only, and its application varies with the particular circumstances of each case. It has been held by this court, that the important question to have in view in passing upon the admissibility of such testimony is: Will it aid rather than confuse the jury in reaching its conclusion? In this case, the defendant itself took the initiative on this question and offered expert opinion, based upon alleged observation and experiment with pistols generally, regardless of caliber, and opened a wide door to plaintiff. The evidence complained of was directly responsive to such testimony offered on behalf of the defendant. An important circumstance in the case was the fact that no cauterization or powder marks appeared about the wound. This circumstance on its face tended to negative the theory of suicide. It is generally conceded that a self-inflicted gunshot wound is usually characterized by powder-marks about the opening of the wound. This condition results because of the close proximity at which the muzzle of the weapon is necessarily held from the point of injury. As the distance increases, the chances for such a condition become less. As against this, however, the defendant advanced the theory that where the muzzle of a pistol or

revolver is held close enough against the point of injury to prevent communication with the outside atmosphere, no powder marks will appear on the outside of the wound, and it introduced expert evidence to that effect. This expert opinion was based upon alleged observation and experiment. In the expert testimony offered by the defendant to this effect, no differentiation was claimed as to the caliber of pistols or revolvers.

An excerpt from the testimony of Dr. Bannister, as it appears in the appellant's abstract, will show the record in this respect:

Q. Have you, doctor, in the course of your practice, made some experiments with firing a pistol at an object at various distances? A. Yes, sir. · Q. I will ask you, from what you have observed in a case known to be suicide and from your experience of bullet wounds and from your experience, what would be the condition as to the presence of or absence of powder marks, burns, and smoke upon the skin surface at the point of entrance of the bullet, when the pistol is held in contact with the object at which it is shot? A. My own experience and observation from these experiences, from what I have seen and also from what I have read, if a pistol is held in close contact, there are no powder marks around, but it often goes straight through the hole; no scattering around about it. Q. I would like to have you include in your answer whether or not, any case where the muzzle of the gun is held in close contact, there are burns or smoke marks, as distinguished from powder marks. A. The edge of the wound would be burned and powder marks that are blown into the bone that is to be distinguished from burning the edge of the wound, and powder marks would not be present. Q. When you say burned—the edges would be burned? I will ask you if you mean there that whether it simply will extend out over the surface, or whether it is simply the edge of the skin? A. The edge of the skin. Q. Does it extend over the area of the wound? A. No, sir. Q. Would it be indistinguishable to the ordinary observer? . A. No, sir. Q. What has been your observation and ex-

perience as to the presence or absence of powder burn or smoke mark surrounding the wound by the bullet in the case where the gun or pistol has been held in the vicinity of two or three feet? A. If it would be at any distance further than three feet, powder marks are very liable to be absent. . . . Cross examination: Q. Doctor, your theory is that if the muzzle of the revolver is pressed right against the surface, in that case, then, there will be no indication of powder marks around the wound. None whatever? A. Yes, sir; that is right. Q. You say there would be some indication of some burning around the wound? A. Some burning, yes; but at the edge of the wound. If the revolver were put against the surface, not solid, but so as to leave a little room between the surface and the edge of the revolver, there would probably be a burning and powder marks would escape out there. It would make some difference, also, as to whether or not the surface was solid or whether it was a soft surface. In other words, a soft surface, with the revolver pressed against it, would compress it, so that there would be no chance for smoke or powder marks to escape around the muzzle of the revolver; but, if the surface were hard, there would be a chance for powder marks to escape around it; in other words, the gun pressed—you couldn't press the muzzle of the revolver so hard against, or so close against, the hard surface as you could against the soft surface—so as to prevent that condition. Witness excused.

If the defendant had confined its own expert testimony on this subject strictly to results to be obtained from the use of a 41-caliber revolver, it may be that it could have confined the plaintiff within the same limits. But it opened the door wider than that and, in a sense, challenged the plaintiff to experiment with any revolver, regardless of caliber. The testimony complained of was rsponsive to that offered by the defendant and tended to negative the same. Whatever the abstract rule might be in a proper case, the defendant itself rendered admissible the evidence now complained of so far as the caliber of

the revolver is concerned, and is in no position to complain thereof.

Turning now to the question whether the difference between a bacon skin and a cabbage head, and human skin and a human head, presents such an essential difference in

2. SAME.

condition as to render the evidence inadmissible, we have to say that we do not think that such objection was fairly made to the trial court. We may say, also, that identity of material in such a case would be a practical impossibility. It does not appear from the record what material was used by defendant's witness, Dr. Bannister, in his experiments, but we may well assume that it was not a human head. In *Thrawley v. State,* 153 Ind. 375 (55 N. E. 95), evidence of experiments with a blotting pad was held admissible. In the case before us, the witness brought into court the material which he had used and this was before the trial court at the time the ruling as to the admissibility of the evidence was made. A large latitude of discretion must be allowed to the trial court in ruling upon the admissibility of this class of evidence. As was said in *State v. Nowells,* 135 Iowa, 60: "It is also generally held that the admission or exclusion of testimony of this nature is largely a matter of discretion, and unless it appears that such discretion has been abused to the prejudice of the complaining party, the ruling will not be disturbed on appeal."

It is to be noted, also, that many of the utterances quoted in appellant's argument in support of its contention were made by appellate tribunals in support of the trial court, where it had excluded proffered testimony. We are satisfied that sufficient similarity of condition was shown to warrant the exercise of the court's discretion in favor of the admissibility of the testimony.

II. The other point, wherein the record in the

present case differs somewhat from that in the former

3. FRATERNAL IN-
SURANCE:
suicide: cir-
cumstantial
evidence: in-
structions.

case, relates to the instructions of the court. Complaint is directed to instructions numbered 6 and 7. In order to deal with these complaints, we must consider also other instructions given, and we set out herewith six of the instructions:

(3) Under the plea the only issue for your determination is whether or not B. W. Scott died from his own wilful act, or in other words, committed suicide. If he committed suicide your verdict should be for the defendant. If he did not commit suicide, your verdict should be in favor of the plaintiff for the full amount claimed, to wit, $816.20.

(4) The burden of proof is upon the defendant to prove by the greater weight or preponderance of the evidence, that he did commit suicide. Unless it has thus proven said fact, your verdict will be for the plaintiff, and if it has thus proven said fact, your verdict will be for the defendant.

(5) The law presumes that men love their lives and will not commit suicide, but this presumption is a rebuttable one, and if the circumstances are sufficient to indicate to you that Mr. Scott did commit suicide, you should so find.

(6) In order to find that Mr. Scott did commit suicide from the circumstances in evidence, they should all point clearly to the fact of suicide and be inconsistent with any other reasonable hypothesis.

(7) In order to warrant a verdict for the plaintiff, it is not necessary that you must be satisfied that the deceased was either murdered or killed by accident. The plaintiff is not required to prove by whom or in what manner the shot was fired. The burden is upon the defendant to satisfy you, by the preponderance of the evidence, that the pistol shot wound was self-inflicted, and if, after considering all of the evidence in the case, you are unable to say by whom or how said wound was inflicted, then your verdict should be for the plaintiff.

(9) As stated above, the sole question for your deter-

mination is whether or not Mr. Scott committed suicide, and as this is the decisive issue in the case, your verdict will be for the defendant, if you find that he did commit suicide, and for the plaintiff, if you fail to so find.

The general complaint as to instructions 6 and 7 is that the court laid upon the defendant too great a burden of proof. The criticism is directed to the use of the word "clearly" in the sixth instruction, and to the use of the word "satisfy" in the seventh instruction. The argument is that by instruction 6 the defendant was required to prove the fact of suicide "clearly," instead of by preponderance of the evidence. We are not disposed to commend the use of the word "clearly" in such a connection. We are constrained to hold, nevertheless, that its use is not fairly subject to the argument against it. This instruction does not require the fact of suicide to be proved "clearly," as contended by appellant. This instruction only undertakes to set forth the rule as to circumstantial evidence. Defendant's proof rested wholly in circumstances. It is not claimed to be improper for the trial court to say to the jury that in order to find the fact from the circumstances such circumstances must be inconsistent with any other reasonable hypothesis. To say, also, that these circumstances "should all point clearly to the fact of suicide" is putting the case no stronger than to say that they must be "inconsistent with any other reasonable hypothesis." The instruction did not require the fact of suicide to be clearly proved, but it did require that all the circumstances relied on should clearly point that way. We think, therefore, that the instruction in this respect was not technically erroneous, although its form was such that it might have been misunderstood. Considering it, however, in connection with instruction No. 4, which stated the rule as to the burden of proof and the preponderance of evidence, we think there is no fair ground of complaint.

Turning now to the seventh instruction, the criticism

is directed against the last sentence thereof, and is two-fold. The first criticism is directed against the use of the word "satisfy." It is to be noted that

4. SAME: mislead- ing instruc- tions.

"satisfy you by the preponderance of the evidence" is the language of the court. The use of the word "satisfy" without this qualification has been heretofore condemned in *Rosenbaum v. Levitt,* 109 Iowa, 292. In *Ball v. Marquis,* 122 Iowa, 665, where the use of the word "satisfy" was qualified as in this case by the rule as to preponderance of evidence, it was held that the instruction was not misleading, although the use of this particular language was criticised. A similar state of the record appeared in *Jerolman v. C. G. W. Ry. Co.,* 108 Iowa, 178. In that case, also, the use of the language was criticised as possibly misleading, but it was held that, taken in connection with other instructions, it was not misleading. We are disposed now to repeat the criticism of this particular language with some emphasis, as being upon the verge of error. But in view of the qualifications shown in the instruction itself, we are constrained to follow the cited cases and hold that the instruction was not technically erroneous nor misleading at this point.

The further criticism made upon this instruction No. 7 is directed to the last clause, namely, "and if, after considering all of the evidence in the case, you are unable

5. SAME: suicide: instructions.

to say by whom or how said wound was inflicted, then your verdict should be for the plaintiff." The argument is that this part of the instruction placed on the defendant the burden of proving two negatives: (1) That the deceased was not murdered. (2) That his death was not caused by accident. It is argued that it is not incumbent upon the defendant to prove either of these. propositions but that it was incumbent on it only to prove that death was caused by suicide. As a matter of mere logic, this position may be conceded. But the evidence in this case was such that proof of suicide

necessarily negatived the hypothesis either of murder or of accident. The nature of the case in this respect is well stated in another part of appellant's argument as follows: "The jury had to find that the death was a matter of murder, accident, or suicide. They could not find it was not suicide, unless it was one of the other two." To which may properly be added, that they could not find it was suicide without finding that it was neither murder nor accident. The burden was on the defendant to prove the suicide. It followed logically that it would have the burden of proving two negatives, in the sense in which it complains of the instruction.

Some complaint is made that the form of the instruction was confused in that the jury was instructed: "If, after considering all of the evidence in the case, you are unable to say by whom or how said wound was inflicted, then your verdict should be for the plaintiff." It is said that this expression "by whom or how" invited the jury into the field of mere speculation, in that the jurors might well say within themselves, We do not know "how or by whom," even though the circumstances indicate suicide; or that, at least, they might say that they did not know just how he did it, even though they found that Scott did in some manner intentionally inflict the wound upon himself.

We think counsel put an undue construction upon the language of the court at this point. The words "by whom" and "how" are not used conjunctively, but disjunctively, and somewhat synonymously. If a special interrogatory had been submitted to the jury, asking "by whom or how" said wound was inflicted, an appropriate answer thereto by the jury would disclose whether the finding was in favor of suicide or otherwise. If yea, a fairly appropriate answer would be, that the wound was self-inflicted. If from the form of the interrogatory, the jury might deem it necessary to incorporate any further finding in their

answer in order to make it fully responsive to such inter-
rogatory, it could be no more than to say that such wound
was so inflicted by shooting with a revolver.  Concededly,
the defendant was not entitled to a verdict, unless the
jury could say from all the evidence that the wound was
intentionally inflicted by Scott himself.  Granting that
that much was sufficient for the purpose of a verdict in
favor of defendant, and that the details of method were
not material, yet the method of inflicting the wound, as
by shooting with a revolver, was one of the conceded facts
in the case and enters into the theory of each party.  If
the jury could have deemed it necessary to make a finding
thereon, it would have been formal only and would have
added nothing to the burden on the defendant.  Whether,
therefore, the expression "whom or how" be construed as
conjunctive or disjunctive, it could work no prejudice to
the defendant.  Further, if there was danger of mislead-
ing the jury by want of precision and directness in the
language of the instruction at this point, it was all quite
cleared by instruction No. 9, which we have above set
forth, wherein the attention of the jury was properly and
concisely directed to the one question for determination.

Inasmuch as a dissenting opinion is filed herewith,
a few further observations as to points discussed therein
may not be inappropriate.  In paragraph 1 of this opinion,
we have copied in full the sole objection appearing in the
record which furnishes any basis for the discussion in
paragraph 1 of the dissenting opinion.  We have also set
forth that part of the testimony of Dr. Bannister, a witness
for appellant, which sets forth the theory advanced by
appellant as explaining the absence of powder marks on
Scott's wound.  This theory was based upon Dr. Ban-
nister's expert opinion, and such expert opinion was based
upon alleged observations and previous experiments made
by Dr. Bannister.  The condition of a successful experi-
ment, as described by this witness, was that the pistol must

be placed close enough to the surface of the object, so that smoke or powder could not escape. To accomplish this successfully a "soft surface" was required, because a hard surface would permit the escape of smoke. This was the theory put forward by appellant by its expert testimony. Did the testimony of Dr. Myerly, on behalf of appellee, fairly tend to negative this testimony of Dr. Bannister? That is the only fair question at this point. What the witness Myerly called "bacon skin" is characterized in the dissenting opinion as "hog meat." Inasmuch as this is literally correct, we do not complain of the characterization, although it makes the comparison with a human head somewhat more odious. The writer hereof will be swift to concede that there is a difference between a human head and "hog meat," but he is not ready to concede that the former is more "soft" than the latter. Hard "pressure" of the revolver and a "soft surface," upon which to press it, were the essential conditions to a successful experiment according to appellant's witness. If the "hog meat" and the cabbage head met the condition as to a "soft surface," and if Myerly met the condition as to "pressing hard" upon it with a revolver, then how can it be said, as a matter of law, that the conditions of Myerly's experiments were not similar to those described by Bannister? Plaintiff did not take the initiative on this subject. She did not offer this testimony as affirmative proof of homicide or accident. She offered it only to negative a theory advanced by appellant's witness. The testimony of Myerly was fairly responsive to that of Bannister and it tended to disprove his theory.

It is said that instruction six states the rule applicable to criminal cases, and not the rule applicable to civil cases. This instruction only purports to deal with the rule governing circumstantial evidence. If there is any difference in the statement of this rule, when applied to a civil case, from its statement, when applied in a criminal case, such

difference has not been pointed out in the dissenting opinion. This rule inheres in the very nature of circumstantial evidence. The weight of the evidence is quite another question and this instruction does not purport to deal with that.

As to the first point made against the seventh instruction, there is much force to the reasoning of the dissent. But the question has been heretofore considered by this court in the cases already cited and a contrary conclusion was reached. If the present dissent had been interposed then, it might have been effective. But the question was fully considered and the conclusion reached was concurred in by the entire court. The point is therefore foreclosed, unless we overrule the cited cases. The expression "by whom or how" contained in the seventh instruction appears in the dissenting opinion as "by whom and how."

The dissenting opinion puts a construction upon the majority opinion at one point to which special attention should be directed, lest the majority opinion be thereby misunderstood or misconstrued. At this point the majority opinion is construed to say "that even if these instructions be conceded to be erroneous, there was no error, because in other instructions the true rule is given." Inapt has been the language used in the majority opinion, if it will fairly bear this construction. This disclaimer is perhaps sufficient to direct attention to the language of the majority opinion itself at this point, and to negative an implied assent to the construction thus placed upon it.

It is the conclusion of the majority that no proper ground of reversal appears in the record, and the judgment entered below is therefore *affirmed*.

Deemer, C. J. (dissenting).—My dissent in this case must be even more emphatic than in the case of *Scott v. Sovereign Camp*, referred to in the majority opinion. In this case, the experiments were conducted with a piece of

hog meat placed on a cabbage head. Save in a figurative sense, I have heard of human heads being called cabbage heads, but never before has such an idea been treated seriously. I do not believe that a piece of hog meat (otherwise undescribed) should be treated as the equivalent of the skin and flesh upon a human head. Moreover, it is admitted in this record that there was no similarity in the revolvers used and there is no showing of similarity in the loading of the shells. Every man knows that some cartridges are loaded with black powder and some with smokeless; and it is common knowledge that the force of an explosion from a 22 cartridge is less than from one of large size, as a 32 or a 40 one. That the results of experiments can only be given when they are shown to have been had under substantially similar conditions, as the main fact inquired about, is too fundamental to require the citation of authorities, but see, *Burg v. Chicago, R. I. & P. R. R.,* 90 Iowa, 106; *State v. Fletcher,* 24 Or. 295 (33 Pac. 575); *State v. Cater,* 100 Iowa, 507; *McMurrin v. Rigby,* 80 Iowa, 322; *Mayer v. Thompson Co.,* 116 Ala. 634. Another significant fact is that the experiments were not performed in the presence of the jury.

On the proposition here involved, I quote the following from *State v. Justus,* 11 Or. 178 (8 Pac. 337, 50 Am. Rep. 470). "When it is considered how much other marked characteristics in conjunction with powder burns aid in determining the fact of near wounds—what seemingly immaterial circumstances—even the kind or compound of the wadding used, may affect the appearance of gunshot wounds, how fundamentally different is the human body in nature and texture from the substance upon which the experiments were made; and when it is considered how important it is that experiments should be based on conditions and circumstances as nearly as possible like the matter they are intended to illustrate, to avoid the liability to misconception, or error from some supposed agreement

or resemblance, we should certainly hesitate to admit such experiments as evidence, unless supported by reason or sanctioned by authority."

That experiments should be made with a gun of the same make or caliber and that a similar charge or cartridge should be used, see, as exactly in point, *Morton v. State* (Tex. Cr. R.) 71 S. W. 280, which is closely in point. *Clark v. State,* 38 Tex. Cr. App. 30 (40 S. W. 992); *State v. Nagle,* 25 R. I. 105 (54 Atl. 1063, 105 Am. St. Rep. 864); *State v. Asbel,* 57 Kan. 398 (46 Pac. 770); *People v. Clark,* 84 Cal. 573 (24 Pac. 313); *Beckett v. N. W. Masonic Aid Ass'n,* 67 Minn. 298 (69 N. W. 923); and cases cited in 12 Am. & Eng. Ency. of Law (2d Ed.) p. 407.

I think the majority are in error in holding, in the first division of this opinion, that the experiments were under similar conditions to the main fact which was the subject of inquiry. I do not think that the examination of Dr. Bannister by the defendant opened the door to the testimony offered by plaintiff, as suggested by the majority. In the first place, plaintiff did not object to the testimony of Dr. Bannister, thus admitting that his experiments were made under similar conditions, and there is absolutely nothing in his testimony showing that they were not so made. There is absolutely nothing to show that he did not use the same kind of revolver and nothing to show that he did not use the human head ˙of one deceased, as he might well have done. A careful reading of his testimony clearly shows that the door was not opened to plaintiff to show the results of incompetent experiments. If there is anything to show that he used a different sized revolver from that with which the wound was inflicted upon the deceased, or that he used anything in his experiments similar to a piece of hog meat and a cabbage head, I have not found it. Unless it affirmatively appears that he did, plaintiff was not justified

in using such experiments upon the theory that defendant had made such testimony competent by making the same kind of experiments itself. It may be that the hog meat and cabbage head were not formally offered in evidence, but the majority admit that they were brought into court by the witness, were present when the court made the rulings, and were used in the case just as the pork rind and hog's head were in the case against the Sovereign Camp. In that case it was held in order to avoid a reversal, that this use made them testimony, and as no objection was made thereto, the subsequent reception of the things themselves added nothing to what was already in evidence without objection. Now in this counsel objected to the use of the meat or rind and cabbage by the witness, because of dissimilarities, etc., but his objections were overruled, and the majority say in this opinion that he was not objecting to the introduction of the cabbage head and meat. Counsel seems to be caught here between the upper and nether millstone. The rule should be the same in the two cases. Even conceding that an expert may make up his opinion from observations and various experiments, it does not follow that he can make the instruments used by him material and competent as substantive and independent testimony by such use. This is closely pointed out in *People v. Thompson,* 122 Mich. 411 (81 N. W. 344), from which I quote the following: "The record does not show that it was contended or argued that, because steam could, by the use of oil as fuel under one boiler, be raised in a given time, therefore it would have a like effect under the boiler which was in charge of Mr. Thompson. The results of the experiments were given as showing the qualifications of the witness, who testified as to the probable effect of the firing of the boiler in question in the manner in which it was fired." I admit that some discretion in such matters is allowed the trial court; but it is, nevertheless, the rule that experiments

must be under similar conditions. If not, the results thereof admitted in testimony are clearly prejudicial, as an examination of the cases heretofore cited will show.

II. I specially dissent from the holding that instructions six and seven as given by the trial court were not erroneous. Instruction No. 6, to my mind, does more than state the rule as to circumstantial evidence. It gives the rule applicable to criminal cases, and not the one which should be applied to civil ones. In civil cases, although the evidence be circumstantial, nothing more than a preponderance is required; while in criminal ones the testimony must be such as to remove all reasonable doubt. The court, in effect, instructed that it was not enough that the circumstances be inconsistent with some other reasonable hypothesis; but that they should all point clearly to the fact of suicide. If this does not cast more of a burden upon defendant than he was required to bear, then I am mistaken as to the effect of the English language. The court, in its instruction, itself distinguished between the fact that the circumstances should be inconsistent with any other reasonable hypothesis of suicide by saying in addition, that they must all point clearly to the very fact of suicide. In this I think there was error. This error was intensified in the seventh instruction, wherein the jury was instructed that the defendant must satisfy them, by a preponderance of the evidence, that the wound was self-inflicted. This brings the case clearly within the rules of our former cases. See *Rosenbaum v. Levitt,* 109 Iowa, 292, and cases therein cited, and various cases since that time, which will readily be found in the Iowa Citator. The trial court emphasized and intensified this error by immediately saying that "if, after consulting all the evidence, you are unable to say by whom or how said wound was inflicted, then your verdict should be for the plaintiff." The thought of the court in giving these two instructions is thus clearly shown. The circumstances shown must

all point clearly to the fact of suicide, and the burden was on defendant to satisfy the jury by a preponderance of the testimony that the wound was self-inflicted; not only this, but the jury was required to find the very truth as to how the wound was inflicted before a verdict could be rendered for defendant. In other words, unless the jury was able to say in very truth by whom or how the wound was inflicted, the verdict under the instructions had to be for plaintiff. These instructions, taken together, to my mind, clearly show what was in the mind of the court. But concede that the judge had some other thought in mind, it is manifest that a jury would be justified in placing my construction upon them. We sometimes forget, I think, that juries in civil cases must decide them from the preponderance of the testimony. They need not be satisfied as to the very truth of the matter. If this were the rule, many cases could never be decided, because it is often very difficult to determine the exact truth. Reasonable probabilities are all that is required in civil cases.

My thought in this connection is so well expressed in *Stratton v. Ill. Cent. R. R.,* 95 Ill. 25, that I here quote therefrom the following: "Juries are required in civil cases to decide facts upon the weight or preponderance of the evidence, and this, too, where the proof does not show the fact in question to the satisfaction of the jury. In such cases, the jury may find any given fact in a given way, upon their judgment as to the weight or preponderance of the evidence, though they may have reasonable doubts as to the real truth. The law in such cases does not demand that every material allegation be established to the satisfaction of the jury, and it was error to tell the jury so in the instruction. The instruction referred to proof that plaintiff was not guilty of contributory negligence." See, also, *Harnish v. Hicks,* 71 Ill. App. 551; *Mitchell v. Hindman,* 150 Ill. 538 (37 N. E. 916). As one judge expressed it, the burden of proof means no

more than the balance of the proof, without reference to the exact truth. *Munson v. Atwood,* 30 Conn. 102.

We have followed these rules in *Bryan v. Railroad,* 63 Iowa, 464, from which I quote the following: "In civil cases, a fact may be found in accordance with the preponderance of the evidence, *and yet the mind may be left in doubt as to the very truth."* (The italics are mine.) "The triers of an issue in such cases should, when doubts arise, find for the side whereon the doubts have less weight."

To my mind, the majority do not see the vital error in these instructions; certainly they have not answered the objections which I am now urging against them. One suggestion is made in the opinion I desire especially to note before closing, to the end that I may not be bound by the conclusion announced. My construction of the opinion is that even if these instructions be conceded to be erroneous, there was no error, because in other instructions the true rule is given. The difficulty with this proposition is that we can not tell which instructions the jury followed. If conflicting, as they must be if there is any point to the suggestion made by the majority, then, under numerous and familiar decisions heretofore made by this court which I need not cite, the judgment should be reversed.

I cannot close without referring specifically to the case of *Mitchell v. Hindman, supra,* wherein an instruction to the effect that one must prove to the satisfaction of the jury, by a clear preponderance of the testimony, was held to be erroneous. One other point regarding an analogy made by the majority in referring to special interrogatories. Suppose that plaintiff had submitted this special interrogatory to a jury, "By whom and how was the wound inflicted upon the deceased?" Would the trial court have been justified in denying it? Undoubtedly it would, for the reason that it called for testimony, rather than an ultimate fact. But suppose such had been submitted and

the jury had said, "We do not know, but we believe from the testimony that deceased did it himself; yet how, we do not know." Would this have been inconsistent ·with a general verdict for defendant? Manifestly not, and yet if the majority are correct, a general verdict under such a finding should be set aside.

I have very grave doubts about the admissibility of the threats said to have been made by the colored man against the defendant. In view of these doubts, I think the instructions should have carefully guarded the rights of the defendant, and not required a clear showing—a satisfaction of mind—that deceased committed suicide. It certainly was not required of them that they should be able to point out the very man who did the shooting, or the manner in which it was done, before they could find for defendant.

This case, to my mind, is clearly one for reversal.