MARY E. SCOTT, Appellee, v. SOVEREIGN CAMP OF THE WOODMEN OF THE WORLD, Appellant.

Fraternal insurance: SUICIDE: BURDEN OF PROOF: EVIDENCE. An in-
1 surance association relying upon suicide to defeat liability has the burden of proof o. that issue. In this action the question of whether deceased committed suicide so as to render the certificate void, under a stipulation therein that the death of a member by his own hands, except by accident, should avoid the same, is held under the evidence to present a question for the jury.

Same: EXCLUSION OF EVIDENCE: HARMLESS ERROR. Where as in this
2 action a witness testified to every fact within his knowledge concerning the finding of deceased mortally wounded, and who stated that a third person who induced the investigation told him that he heard a gun shot in the vicinity of deceased's office, and stated what he and the third person did in calling a physician to assist, and such physician also testified concerning the discovery of deceased, refusal to permit the witness and physician to further detail what was said by such third person, who was not examined as a witness, was not prejudicial.

Same: SUICIDE: EVIDENCE. Evidence of the general belief of by-standers and officials on the question of suicide, and that no prosecution had been instituted for murder, is not admissible.

Same. Where it is contended in defense of a suit on a life insurance certificate that the deceased committed suicide, the question of deceased's state of mind becomes an important inquiry, and a conversation with deceased at about the time it is claimed he committed the act is admissible as bearing upon that question, when limited to a consideration for that purpose.

Same. Where it appeared, as in this case, that deceased was found in his office fatally shot, and that some other person was in the office a short time prior but his departure was not observed by the witness until about the time of the shooting, testimony of the witness that a day or two previous thereto a third person had displayed a revolver resembling that found near deceased's body, and of another witness that such third person had threatened to kill deceased, when considered together, was admissible to rebut the theory of suicide, its weight being a matter for the jury to determine.

Same: THREATS: ADMISSIBILITY. The rule that a mere threat of a third person unconnected with an overt act is inadmissible as hearsay applies only to threats which are entirely isolated from the transaction, and not to such as tend to elucidate or give character to some other material fact shown in evidence.

Evidence: EXHIBITS: OBJECTIONS. Where exhibits are shown the jury without objection, and in connection with the evidence of a witness who made the same a part of his testimony by constant reference thereto, an objection to the exhibits when offered in evidence merely to perfect the record comes too late.

Admission of evidence: PREJUDICE. An error in the admission of expert evidence which was but a repetition of what the witness had already stated without objection thereto is not prejudicial.

Instructions: INVASION OF PROVINCE OF JURY. The modification of a requested instruction, as in this case, so as to prevent the same from invading the province of the jury is proper.

Same: EMPHASIZING THE FACTS. Where, as in this action upon a benefit certificate, the defense of suicide was interposed and the court in its instructions set forth the hypothesis requiring a verdict for defendant, the further instruction presenting a converse view and setting forth the hypothesis which would require a verdict for plaintiff is held unobjectionable, as unfairly emphasizing the evidence favorable to the plaintiff.
Deemer, C. J., dissenting.

*Appeal from Wapello District Court.*—HON. M. A. ROBERTS, Judge.

THURSDAY, DECEMBER 15, 1910.

ACTION at law to recover a death benefit on a certificate of membership in a fraternal beneficiary association. The defense was that the deceased came to his death by means of suicide. Verdict and judgment for the plaintiff. Defendant appeals.—*Affirmed.*

*A. H. Burnett, Frank H. Dewey,* and *Tisdale & Heindel,* for appellant.

*Smith & Lewis,* for appellee.

EVANS, J.—The plaintiff is the widow of B. W. Scott, and is the beneficiary named in a certificate of membership and insurance held by the said Scott in his lifetime in the defendant as a fraternal beneficiary association. One of the provisions of such certificate is that it shall be void if the holder thereof die by his own hand, except by accident. The certificate was issued on January 9, 1906. On January 20, 1907, Scott died from a gunshot wound.

I. The immediate circumstances of his death are involved in much uncertainty. Circumstantial evidence alone is relied on by both parties; the burden of proof being upon the defendant to prove its defense of an alleged suicide. The principal question presented by the appellant for our consideration is, whether the evidence tending to show suicide was so conclusive as to require a directed verdict for the defendant. To this question we will direct our first attention.

1. FRATERNAL
INSURANCE:
suicide: burden of proof:
evidence.

The deceased was a lawyer. He had an office con-

sisting of two rooms on the fourth floor of the Hofmann
Block in Ottumwa, of which the following is a diagram:

He met his death in the smaller room of this office
from a gunshot wound in the head, inflicted about 7 o'clock
on Sunday night, January 20, 1907. He left his home,
according to his custom, about 3 o'clock in the afternoon;
arrived at his office within half an hour. Sometime later
another person was heard to go up the stairs and into
Scott's office. The leaving of the office by such person was
not observed by anyone, so far as disclosed by this record.
There was an elevator in general use in the Hofmann
Block, but its operation on Sunday was confined to certain
specific hours. On the day in question, it was operated
during such hours by the janitor, one Borgstedt. The
elevator was not in operation between the hours of 6 and
7 p. m. Borgstedt left the building about 6:30 and re-
turned about 7. Almost immediately upon his return he
was called to the elevator by the ringing of the elevator
bell. He answered the call by going up to the fourth
floor, where he found one Voyet, who was a tenant of
one of the offices on such floor. Voyet informed him that

he had heard a shot somewhere in some of the rooms. They went down the hall in the direction of Scott's office, looking for fallen plastering as a possible explanation of the noise. When they came near Scott's office, they observed that the door to his main office room was open. They did not go in, but returned to the elevator and down to the ground floor, where they met Dr. Myerly and enlisted his aid. Thereupon all three went up in the elevator to the fourth floor and went through the open door of the office, and found Scott lying on his back in the back room, mortally wounded. When first discovered, he was still breathing slightly, but ceased within a few moments. The main room of the office was approximately sixteen feet square. The circular bay window, shown in the diagram, was in its northeast corner. The door communicating with the hall at the southwest corner was the only door in use for the two rooms. The back room was approximately eleven feet square and lay to the south of the main room. A door opening out of this room into the hall is shown in the diagram. But this door was not in use. Against it was placed a dresser, and over the dresser stood a mirror. The theory of the defendant is that Scott stood before this mirror when he inflicted the wound upon himself. Between the two rooms was a sliding door about six feet wide, occupying a space about equidistant from the east and west ends of the partition. A temporary partition cut off four or five feet of the south part of the back room, reducing the dimensions of the room, in this direction, to six or seven feet. When found, the body lay quite opposite the sliding doors, with the feet towards the dresser and the head and body lying somewhat obliquely a little south of east. It lay upon the back, with arms somewhat extended. In the forehead or temple was a clean gunshot wound, which showed no powder burn nor cauterization of any kind. The exact location of this wound is somewhat uncertain under the evidence. One witness described it as slightly

to the right of the median line of the forehead, "and not as far over as the eye." Other witnesses described it as above the right eye, and others as in the temple. It was located about two inches higher than the eye and "near the hair line." On the opposite side of the head was another wound, which indicated the course of the bullet. This supposed point of exit was described, by some of the witnesses, as slightly lower than the point of entrance, while others said that it was "practically on a level." The stature of the deceased was five feet eight inches. On the floor, near the body was a 41 Colt revolver with one empty chamber. The location of the revolver is variously described, by the different witnesses, as from nine inches to three feet from the right hand of the deceased. So far as shown by the record, this revolver was never known to have been in the possession of the deceased in his lifetime. The defendant was not able to produce any witness who had ever seen this revolver before, or who had known of Scott's having any revolver whatever. On the other hand, evidence was introduced, on behalf of the plaintiff, tending to show that he had no such revolver. There was also some evidence, on behalf of the plaintiff, tending to identify this revolver as one in the possession of another person a couple of days before the shooting, which person claimed to have a grievance against Scott, and threatened violence. The admissibility of this latter evidence is challenged, and we shall give it further consideration later in this opinion.

The theory of the defendant is that this revolver was probably obtained by Scott from some of his clients, either as pay or security for services rendered; that the location of the wound was such that it could not have been the result of accident; that he was alone in his office and could not therefore have been the victim of homicide. As a motive for the suicide, it is urged that in the latter part of November and the early part of December, for a period.

of about three weeks, he had been very ill with typhoid fever; that he was in straitened circumstances; that he had complained to one person that his business was not coming back; that about three years before this time he had been advised by a physician that he had an incurable disease.

Upon a separate reading of the entire record, we have all reached the conclusion that the evidence is far from conclusive in support of the defendant's theory. The only evidence in support of the theory that Scott was alone in his office is the fact that nobody was seen by Borgstedt to leave the building after he returned at 7 p. m., and nobody was found in the office at the time of the discovery of the body. But, on the other hand, it is undisputed that somebody did go into his office about 4 o'clock, and it is not known when such person left. The finding of the revolver, with which the killing was presumably done, near the body of the deceased is not of conclusive significance; and this is especially so when there is a failure to trace the revolver to the possession of the deceased during his lifetime. It is well known that it is a common ruse of the assassin to place the weapon of death in or near the hand of the victim, for the very purpose of creating an impression of suicide. The unknown revolver, the open door, the clean wound, and the time and place, were all consistent with the theory of homicide. The night was cold and dark and the hour was one when the building was apparently deserted. Neither the janitor nor elevator boy was required at his post. The time required for an escaping person to pass from the office, down the stairway, and out of doors would be about one-half minute. The alleged motive lends very little aid to defendant's theory. The alleged advice of the physician, three years before, was resented by Scott and contradicted by another physician, whose advice he sought. His recovery from the typhoid fever was practically complete, so that he frequently

walked from his house to his office, a distance of a mile and a half. He was engaged for the trial of a case for the following day. His means was limited, but his financial condition involved no scandal. He was owing miscellaneous, unsecured accounts in a total of about $1,000. He owned property, however, of considerably greater value, including his home, worth about $2,000. It does not appear that he was being pressed for immediate payment. There was no evidence of any preparation on his part, nor anything indicating a previous intention, nor anything indicating mental aberration or melancholy. His family consisted of his wife and little daughter, fourteen years of age. He had promised to go with his daughter to hear a lecture that Sunday evening. At 6:30 she called him over the phone, to remind him of the appointment. There was nothing in his conversation to indicate any mental derangement or excitement. On the contrary, he said he would be home inside of half an hour. Of course, such circumstances are by no means conclusive against the theory of suicide, but they have their significance, the extent of which is to be determined by a jury, in the light of all the evidence in the case.

An important circumstance in the case was the fact that no cauterization or powder burn appeared upon the wound. Generally speaking, a self-inflicted gunshot wound is said to be usually characterized by powder burns and cauterization about the opening of the wound. This condition will usually result when the muzzle of the weapon is held at a distance of one or two feet or less from the point of entry. As the distance increases, the chances for such a condition become less. It is urged by the defendant, however, that where the muzzle of a revolver is held close enough against the point of entry to prevent communication with the outside atmosphere, no powder burns or cauterization will appear on the outside of the wound, and testimony was introduced to that effect. Such testimony, how-

ever, was disputed by other evidence and the issue at that point was one of experimental fact. According to the testimony in behalf of the defendant at that point, it would require close and persistent pressure to accomplish the result. Even then, cauterization would be found within the walls of the wound; whereas, in this case no cauterization was found either within or without. The evidence at this point, therefore, would justify the jury in failing to find that defendant's theory was fairly established.

It is strenuously urged by the appellant that the case is controlled by some of our former decisions, and particular stress is laid upon *Inghram v. National Union*, 103 Iowa, 395; *Carnes v. Association*, 106 Iowa, 281; *Beverly v. Maccabees*, 115 Iowa, 524, and *Gavin v. Life Ins. Co.*, 149 Iowa, 152. As we have heretofore said, the adjudicated cases furnish little definite aid in passing upon the sufficiency of evidence, because seldom can two cases be found which are alike in their circumstances. It may fairly be said, perhaps, that the evidence in the case at bar is quite as conclusive as that in the cases of *Inghram* and *Gavin, supra*, so far as excluding the theory of accident is concerned. The difference between the case at bar and the two cited cases is very marked, however, when we come to a consideration of the evidence excluding the theory of homicide. In the two cited cases, the circumstances were so conclusive against the possibility of homicide that it was not even urged as a possible theory in the case. Upon that feature of the case, then, the cited cases furnish us no aid whatever. The *Beverly* case was one wherein the jury was waived in the court below and the finding of the trial court was in favor of the defendant. It was held, on appeal, that such finding had sufficient support in the evidence. In the *Carnes* case an accident policy was involved, and the burden was upon the plaintiff to prove that death resulted from accident, and not from suicide. In the case at bar, the burden is upon the defend-

ant. It is our conclusion that the defendant was not entitled to a directed verdict, and that the trial court properly sent the issue to the jury.

II. Borgstedt and Myerly were witnesses on behalf of the defendant. Each testified to the circumstances attending and immediately preceding the discovery of the body. Neither of these witnesses had heard the shot. Their attention was directed to the investigation by Voyet. Borgstedt was asked to state what Voyet said to him. He was permitted to testify that Voyet told him that he had heard a shot somewhere upstairs, "near our place, somewhere in one of those rooms," and he was permitted to state what was done by himself and Voyet. He was not permitted, however, to go into further details of what was said by Voyet. Dr. Myerly also was asked to state what was said to him by Voyet and Borgstedt, when they met him on the ground floor, and he was not permitted to state such conversation. The defendant complains of these rulings. We see no prejudicial error therein. For some reason not appearing in this record, Voyet was not examined as a witness. Borgstedt was permitted to testify on the trial to every fact within his knowledge. It does not appear, from the record, what further statement of Borgstedt or of Voyet was proposed to be proved. It is urged by appellant that the testimony was competent as a part of the *res gestae,* and that it was material to explain Dr. Myerly's presence in Scott's office. If we should concede the competency of the evidence, yet its materiality is not made to appear. Borgstedt however, was permitted to testify that upon discovering the open door of Scott's office, he and Voyet immediately went down the elevator to find assistance, and that they immediately found Myerly and conducted him to the place. This was an abundant explanation of Myerly's presence at the place. If, therefore, the materiality of the proposed

*2. SAME: exclusion of evidence: harmless error.*

evidence had been shown as explanatory of Myerly's presence, its conclusion was manifestly without prejudice.

III. The defendant offered evidence, in. its main case, tending to show a general belief on the part of bystanders and public officials that Scott had committed suicide, and that no prosecution was ever instituted against any person for alleged murder. This testimony was all excluded by the court, and the defendant complains of such exclusion. We know of no rule that would admit such testimony. Such opinion or general belief threw no light whatever upon the circumstances under investigation before the jury. It might have been based upon a knowledge of facts or upon an absence of such knowledge. The jury was required to determine the question in the light of facts established by sworn testimony, duly sifted and tested on both sides by proper objections and by cross examination, and under the guidance of the court as to the burden of proof and as to the other legal rules applicable to the case. It was available to the defendant to produce any witness who knew facts sufficient to warrant his belief in the theory of suicide, and to prove such facts by such witness. Whether such facts were sufficient to justify the conclusion of suicide was always a question for the jury, under proper instructions from the court. Such facts could not be supplemented by the belief of the witness, as to the conclusions which should be drawn from them. We think the trial court properly ruled out the evidence along this line.

*3. SAME: suicide: evidence.*

IV. Complaint is made because of the admission of certain evidence of the witness Mildred Scott, the daughter of the deceased. She testified as to her conversation with her father over the telephone at 6:30. A part of this conversation has already been detailed. The remainder of it was that the deceased said that there were some clients in his office, but that he would be home in time to go to the lecture. This testimony was

*4. SAME.*

offered only for the purpose of disclosing the state of mind of the deceased at the time of the conversation. It was objected to as being mere hearsay and incompetent. The court admitted it for the limited purpose for which it was offered, and expressly instructed the jury that the statement of the deceased, that he had clients in the office, could not be regarded by them as any evidence of such fact; that they could consider such evidence for no other purpose than as bearing upon his apparent state of mind at the time of such conversation. With the limitation which the court put upon it we think the evidence was admissible for what it was worth. The time was close; the state of mind of the deceased at the time was an important inquiry; his conversation was one of the methods by which such state of mind might be disclosed. It might have been of greater significance if it had indicated excitement or despondency, or mental derangement, or a threat of suicide. It would then have been clearly admissible. As to this conversation, such as it was, its probative value was negative only; but it was nevertheless a circumstance fairly bearing upon the ultimate question. We think there was no error at this point.

V. Evidence was introduced on behalf of plaintiff, tending to show that shortly prior to the death of the deceased a negro, known in the record as "Steamboat Taylor," claimed to have a grievance against Scott and threatened that he would kill him. Evidence was also introduced that about the same time, though not to the same person, he exhibited a revolver which resembled the revolver found near the body of Scott. The testimony referred to is fairly epitomized in appellant's brief as follows: "The witness Rush testified that on Friday before Scott's death a colored, man named Taylor was in his restaurant and had a gun, and that the revolver with which it was conceded Scott was shot looked like the revolver Taylor had. Poston testified

5. Same.

that about a month before Mr. Scott's death this colored man, Taylor, retained him to procure from Scott a watch which he had left with him to secure a fee, and that on Friday, before Scott's death, Taylor told him that if Scott did not give up the watch, he would kill him before he left town." This testimony was received over objection from the defendant and strenuous complaint is made by reason thereof. The alleged threat was made to Poston on the street near a restaurant. No revolver was exhibited to Poston. It is urged that the mere threat of a third person, disconnected with any overt act, is inadmissible as mere hearsay. Assuming this to be the rule, we think that the testimony of Poston and Rush should be considered together, and that the facts testified to by each are closely enough connected to furnish mutual support, one to the other. The two events were close together in point of time. The incident testified to by Rush occurred in his restaurant. Whether this is the same restaurant as is referred to in the testimony of Poston does not appear. The testimony of Rush tended to some degree, at least, to identify the revolver found near Scott's body with the one seen in Taylor's hands on the Friday night preceding. Conceding that the testimony was weak and unsatisfactory as an identification, this affected only its weight. It did fairly tend in that direction and was therefore admissible. If this evidence was admissible, we think it had the effect to render admissible, also, the testimony of Poston as to the alleged threat to kill.

The rule contended for by defendant applies only to threats which are entirely isolated from the transaction under investigation, and not to such threats as tend to elucidate or give character to any other material fact shown in the case. *State v. Beaudet,* 53 Conn. 536 (4 Atl. 237, 55 Am. Rep. 155). If we should say, by way of illustration, that the revolver found near the body of Scott was posi-

6. SAME: threats: admissibility.

tively identified as being the same revolver that was exhibited by Taylor to Rush in the restaurant, that would be a very material fact, as tending to rebut the theory of suicide; and the threat to kill, as testified to by Poston, would tend to elucidate and give significance to the presence of Taylor's revolver near the dead body of Scott. The illustration is stronger than the case. Rush's evidence did not positively identify the revolver; but it tended to do so, however, and, to some extent, to negative the alleged isolation of the threat. The whole question rested upon circumstantial evidence alone. It was made to appear by the direct evidence of Borgstedt that there was some person in the office with Scott late in the afternoon. Borgstedt did not observe his departure at any time, although he did not leave the building until 6:30. This circumstance is proper to be considered, as bearing upon the admissibility of the testimony of Rush and Poston. Some discretion must be allowed to the trial court as to the latitude of circumstantial evidence. We think the trial court properly admitted the testimony. As bearing somewhat upon the question, see the following authorities: *Commonwealth v. Trefethen,* 157 Mass. 180 (31 N. E. 961, 24 L. R. A. 235); *Leonard v. Territory,* 2 Wash. T. 381 (7 Pac. 872); *Soules v. Brotherhood Yeomen,* (N. D.) 120 N. W. 760; *Murphy v. State,* 36 Tex. Cr. R. 24 (35 S. W. 174); *State v. Hawley,* 63 Conn. 47 (27 Atl. 418).

VI. Dr. Myerly, who was first used as a witness by the defendant, was called later by the plaintiff. At the request of plaintiff's counsel, he had made some experiments with the revolver, found near the body of Scott, with a view to ascertain the circumstances under which powder burns and cauterization would be caused by the discharge of a loaded cartridge therefrom. He testified on behalf of plaintiff concerning such experiments. These experiments were

7. EVIDENCE:
   exhibits:
   objections.

made "upon a fresh pork rind and upon a hog's head that had been killed the day before." These experiments were conducted by drawing the pork rind over the hog's head and discharging into the same a bullet from the revolver. This experiment was repeated at varying distances. The circumstances of each shot and the distance at which the revolver was held each time were described, and results as to powder burns and cauterization were exhibited to the jury by the witness. Some of these shots were fired with the muzzle of the revolver pressed hard against the pork tissue. The substance of such testimony was that the witness had been unable to press the muzzle hard enough to avoid powder burns and cauterization. The wounds inflicted by the shots made under such circumstances were exhibited to the jury, as showing the powder marks and the cauterizing. All this testimony was received without objection up to this point. Thereupon the plaintiff had the "pork rind" and the "head" identified as exhibits, and the same were formally offered in evidence. To this offer objection was made, as "immaterial and incompetent." Fortunately the exhibits are not before us. These exhibits were exhibited to the jury without objection, in connection with the evidence of the witness, before they were formally offered. The witness had made the same a part of his testimony by constant reference thereto. To this no objection was made. They were illustrative or demonstrative only. Their formal offer in evidence only perfected the record. Such formal offer added nothing to the practical effect of the evidence as already given. If there was objection to their use for illustrative purposes, it should have been sooner made. This question is more fully discussed in the opinion in *Scott v. Homesteaders,* filed herewith.

After this witness had testified as above indicated, he was asked broadly to state his opinion as to the distance at which the revolver must have been held from Scott's head at the time the wound was inflicted upon him, and

he was asked to base his opinion upon his knowledge and
experience with gunshot wounds, and from
his observation of the condition of Mr.
Scott's wound as witness himself saw it.

8. ADMISSION OF
   EVIDENCE:
   prejudice.

Objection was made to this proposed evidence as not a
subject of expert testimony, and that the witness had not
shown himself competent as an expert.    The objection
being overruled, the witness answered that in his opinion
the revolver must have been held more than two feet
from Scott's head.    This testimony is now complained of.
So far as the expert character of the witness is concerned,
he was first used by the defendant, and although he gave
no expert testimony for the defendant, some foundation
was laid to that end and he was shown to be a regular
physician of many years standing.    If this were not suf-
ficient, the defendant went into the subject fully upon
cross examination, wherein the experience of the witness
was sufficiently shown.  . Whether such interrogatory as put
was not too broad is a grave question.    But the answer
was clearly nonprejudicial.    Such answer was a mere
repetition of what the witness had already contended in
his testimony, as to the result of the experiment made with
the particular revolver, all of which had been received
without objection.

VII.    The court gave instruction No. 5 as follows:
"(5) You are instructed it is not·necessary that the de-
fendant should prove the decedent, B. W. Scott, committed
suicide, by direct evidence, but can prove
same by facts and circumstances.    In passing
on this question, you will take into considera-

9. INSTRUCTIONS:
   invasion of
   province of
   jury.

tion the condition in which the body of decedent was found,
the location of the revolver with reference to the body of
decedent, the time of day, the place, the condition of mind
of the decedent, his physical condition, *the fact, if it is
a fact, that there is an* absence of any explanation as to
his death having been caused by any other person than

himself, all as shown by the evidence in the case, and all other facts and circumstances shown by the evidence in the case bearing on this question, and if, therefrom, you find by the greater weight or preponderance of the evidence that the said B. W. Scott killed himself, then your verdict will be in favor of the defendant." This instruction was given at the request of the defendant, except the words we have italicized. The italicized words constitute a modification made by the court upon the instruction, as formulated by the defendant. The defendant complains of such modification. We are of the opinion that such modification furnishes no ground of complaint to the defendant. It is in accord with the ordinary precaution of the trial courts, to avoid any invasion of the province of the jury.

VIII. In instructions Nos. 4 and 6 the trial court instructed the jury that the burden of proof was upon the defendant to prove that the deceased committed suicide, and that if the facts and circumstances proven were inconsistent with any other theory than that of suicide, the verdict must be for the defendant. The seventh instruction stated negatively that the plaintiff was not required to prove either murder or accident, nor by whom, nor in what manner, the deceased was killed, but that the burden of proving suicide was on the defendant, and if, under all the evidence, "you are unable to say by whom or how said wound was inflicted, the verdict should be for the plaintiff." This instruction is complained of. The specific complaint is that its effect "was to place undue emphasis upon the negative side of the case." We can not draw too fine a line upon the emphasis which the trial court may place upon a correct proposition of law. Such emphasis sometimes arises out of incidents of the trial which are not of record. We are not impressed that there is undue emphasis at the point complained of. Instructions 4, 5, and 6 each set

10. Same: emphasizing facts.

forth a hypothesis which would require a verdict for the defendant. The final conclusion of each instruction was, that upon such hypothesis "your verdict will. be for the defendant." Such a conclusion had the effect to emphasize somewhat the point of view of the defendant. Instruction 7 presented a converse view and set forth a hypothesis which would require a verdict for the plaintiff, and its final conclusion was, that "your verdict should be for the plaintiff." We think the emphasis, therefore, was fairly equalized and the defendant has no fair cause of complaint in that respect.

The foregoing comprise the most important debatable questions in the case. Many other specific errors are assigned and argued. We can not devote the time to a detailed discussion of all of them. Sufficient to say that we have given them all careful consideration and find none of them well taken.

The judgment below must therefore be *affirmed.*

DEEMER, C. J. (dissenting).—From the argument and conclusions in the sixth and eighth paragraphs of the opinion I must dissent. The reason for this dissent from the eighth division of the opinion will be set forth in a dissent which I shall file to a companion case decided at the present term, entitled *Scott v. The Homesteaders,* 149 Iowa, 541.

My dissent from the sixth paragraph of the opinion in this case is based upon two fundamental propositions: (1) The majority hold that because a witness at the request of counsel tells what he did with a piece of independent testimony, which may or may not be admissible as substantive testimony, such as a pork rind and a hog's head, that when this piece of real testimony is offered as substantive and independent evidence, to speak in and of itself, objection thereto is not good, because of the use of and explanation made by the witness of these items of

substantive proof. To this I can not agree. The effect of the rule announced is to hold that if a witness makes use of a piece of real or documentary testimony, which is inadmissible in itself, the real or documentary evidence thereby becomes admissible as substantive testimony. If this be true, then one of two results must necessarily follow: First, it is not necessary in such case to formally introduce any document or piece of real testimony which has been referred to by a witness, for the mere reference makes it a part of the case, although not offered in testimony; or, second, the mere reference by a witness to incompetent substantive testimony makes this substantive testimony competent and admissible. I can not agree to either proposition. The pork rind and hog's head were offered in this case as substantive, independent testimony, and I think we are required to pass upon the admissibility of such testimony. These items were offered not only to strengthen the testimony of the doctor, but as independent testimony of the effect of a pistol shot, fired at different distances. No proper foundation was laid for these pieces of property as independent testimony in and of themselves; that is to say, the size and character of the revolver and the nature of the powder used in the shells was not disclosed. There is no such similarity between the human head, with its covering of skin and flesh, and a pork rind and hog's head, as would justify the introduction of the latter, with the effects of a discharged revolver thereon, in testimony.

Again, the doctor who testified regarding his experiments was asked as to the distance at which the revolver must have been held from Scott's head at the time the wound was inflicted upon him. To this objection was made, but it was overruled, and the witness was permitted to answer. If this was not invading the province of the jury, then I am at a loss to know how a question could be framed which would do so. A jury in such cases is

prone to seek for some justification for a verdict for plaintiff, and if such testimony is permitted, it is very easy for it to say its justification is found in such testimony as was here introduced, forgetting that this was the very question for it to determine, under all the testimony, rather than to have the matter solved for them by an expert, who did not pretend to know all the facts in the case upon which the jury was required to act. The case of *Sachra v. Town of Manilla,* 120 Iowa, 562, is exactly in point on this proposition. The answer given by the witness was much more than what he had theretofore testified to; in that he was asked, after detailing the results of his experiments and observations, to settle for the jury one of the very matters in dispute. .

I think these matters, with the erroneous instructions given by the trial court, as pointed out in my dissent in the *Homesteaders* case, call for a reversal of the judgment.