SOPHIA TACKMAN, Appellee, v. THE BROTHERHOOD OF AMERICAN YEOMAN, Appellant.

**Mutual insurance:** EVIDENCE. In a suit upon a mutual benefit certificate, the certificate, independent of the application and by-laws though a part of the contract, is admissible on an issue as to whether the copy thereof as set out is true and correct.

**Same:** SUICIDE. In a suit on a benefit certificate providing that defendant should not be liable in a case of suicide, the evidence is held to warrant a submission of the question whether death resulted from accident or was suicidal.

**Evidence of experiment.** Where it is contended that a deceased commited suicide, proof of experiments showing that his death might have been accidental, is admissible.

Instinct of self preservation: PRESUMPTION. In the absence of evidence to the contrary one is presumed .to have been in his right mind prior to his death, and the presumption arising from the instinct of self preservation should be considered in determining whether the death was suicidal.·

*Appeal from Butler District Court.*— Hon. Clifford P. Smith, Judge.

Saturday, March 10, 1906.

Rehearing denied, Thursday, October 25, 1906.

Action on certificate of membership in the defendant association resulted in a verdict and judgment for the plaintiff.   The defendant appeals.— *Affirmed.*

*Edgar C. Corry* and *Edwards & Camp,* for appellant.

*George A. McIntyre,* for appellee.

Ladd, J.— The association issued a certificate of membership to Heinrich Tackman November 12, 1901, in which the plaintiff was named as beneficiary. . He was found dead October 24, 1905, and the object of this action is the recovery of the indemnity stipulated in the certificate.   A clause therein exempts defendants from liability " if the said member   .   .   .   shall die of suicide, whether sane or insane," and this was the only defense interposed.

I.   When counsel for plaintiff introduced the certificate of membership objection. was made on the ground that it was not accompanied by the application and by-laws.   To this it was said these were attached to and made a part of the policy, whereupon the objection was overruled.   Whether this was so we have no means of knowing, but, assuming it not to be true, the ruling was correct.   The defense was not based on either the application or by-laws, and that a certificate had been

1. Mutual Insurance: evidence.

issued providing for indemnity as alleged was admitted in the answer. The only issue with respect to the certificate was whether the copy set out was true, and this was disposed of by the introduction of the certificate in evidence without other portions of the contract. *Rogers v. Cedar Rapids Ins. Co.,* 72 Iowa, 448, relied on by appellant, is not in point, for there the answer set up the invalidity of the policy owing to false statements contained in the application, and the court held that, as the latter was made by the policy a part of the contract, it was error to admit the one in evidence unaccompanied by the other. Here the certificate alone disposes of the only issue raised; that is, whether a true copy was attached to the petition.

II. Appellant insists that a verdict should have been directed for the defendant on the ground that the evidence of suicide was conclusive. The disposition of this question necessitates a brief review of the evidence. Tackman was nearly forty-seven years of age at the time of his death. His domestic relations were agreeable. He had been married twenty-six years and had four children. The evidence indicated that he had enjoyed good health until the summer before, when he suffered from gastritis, which rendered him nervous, and he was worried in the fall because of a partial failure of the corn crop. About a week prior to his death he appears to have complained to his neighbors of his financial condition, which was not at all serious, and appeared to be excited. Three days prior to his death a load of hay, which he was hauling to market, tipped over, and those who saw him immediately thereafter testified that his talk was confused. He did no work during the next two days, and complained of trouble in his head. But he plowed in the forenoon of the day of his death. In the afternoon he was engaged with his son Henry, a boy of sixteen years, in burning some old grass, and at about three o'clock went to the barn to get the team to resume plowing. After he had been gone about an hour, Henry followed to

2. SAME: suicide.

look for him, and found him suspended to a peg on which harnesses were ordinarily hung at the end of the partition between the teams.   A bridle with a tie strap was hung on this peg with the lower end about his neck.   Henry testified that he was facing diagonally back from the partition with his knees bent, one hand in his trousers pocket and body resting on his heels with the strap about his neck, his head leaning forward.   The boy took a knife from his father's pocket and cut the strap, and the corpse fell forward.   He then informed his mother, who returned with him, and he pulled the strap from about his father's neck without any obstruction in the way of a knot, but there was a dent in the strap as though another part had been drawn over it.   There were ridges on the neck, but no froth at the mouth nor other indication of strangulation.   One Olney testified that he had hung a bridle with a tie strap attached on a peg in a partition of like height and threw the tie strap over the peg, leaving a loop hanging down about half way on the breast of a man of the same height as deceased.   The location, height, character, and situation of the peg and the bridle and strap correspond with those where deceased was found hanging. The witness was substantially of the same height and weight. He walked along next to the partition and fell with his head in the loop.   The result was that the strap was drawn around his neck in such a way that it caught or drew over itself, and would have choked him to death had he not regained his balance.   This was repeated many times in the presence of other witnesses, and the same result happened about three times out of four experiments.

It is contended by appellant that from this evidence it can only be inferred that deceased tied the strap about his neck and voluntarily sank down to strangulation and death. On the other hand, plaintiff's contention is that the bridle was hanging on the peg with the tie strap over it in the form of a loop, and that Tackman, in walking along the partition between the stalls, fell with his head in the loop, and the

tie strap was drawn about his neck so that, owing to his enfeebled condition, he was unable to release himself and was choked to death.   Undoubtedly, it might have been inferred from all this evidence that the deceased had taken his own life.   The admissions of plaintiff to that effect are of little consequence for they were not based on any facts other than those detailed.   *Supreme Tent v. Stensland,* 206 Ill. 124 (68 N. E. 1098).   Tackman may have been discouraged and somewhat despondent concerning his affairs; but his relations to his family were agreeable, and his financial condition not such as to drive any one to desperation.   The evidence, then, aside from the situation in which his body was found, furnished little aid in solving the problem before the jury.   In the absence of any eyewitness to the transaction, the cause is necessarily a matter of inference.   Conceding the evidence of the experiments to have been rightly received, it is manifest that the jury might have concluded that death resulted from accident, in the manner explained by the witness Olney.   He had been injured but a few days before, and would be less likely than when in ordinary health to save himself if caught in such a situation.

Moreover, the instinct of self-preservation and love of life is so pervading an element of human nature that the presumption always obtains against self-destruction, and this presumption is to be treated as evidence in the case.   While such an accident may be exceedingly rare — possibly may never have occurred before — this does not furnish a sufficient reason for saying it did not happen, for the novel, the unexpected, the unforeseen, against which no man may safely calculate, is transpiring every day.   Indeed, death resulting otherwise cannot be classed as accidental.   The court rightfully declined to interfere with the jury's conclusion.

III.   Appellant strenuously contends, however, that the evidence of the experiments was not admissible.   The courts have been very conservative in the matter of receiving evidence in the nature of demonstrations, but it is now well set-

tled that, when the conditions are shown to be substantially the same, evidence of actual experiment is an

**3. EVIDENCE OF EXPERIMENTS.** acceptable aid in determining the issues in a case. Indeed, there is an advantage in experiments over some other kinds of evidence, in that it substitutes experience for speculation and a demonstration in place of what sometimes seems no more than guesswork. The most logical classification of experimental evidence is that found in 5 Encyclopedia on Evidence 482, where the author says: " It is permissible to show: First, in proof of an alleged fact, that a result similar to the fact in question was obtained from an experiment performed under conditions substantially similar to those admitted or proved to exist; second, in disproof thereof, that a result was obtained different from the alleged fact by an experiment performed under similar conditions; and, third, that a similar result was obtained from an experiment performed under totally different conditions." Examples of the first two classes are so numerous that any adequate citation of authorities is impractical. As indicated, the last class contemplates a difference in the conditions, and the purpose of the experiment is to demonstrate that the same result might have happened under different conditions than those supposed to exist. To render the experiment of any probative value, however, the conditions must be such that they may be found to have been not only possible, but reasonably probable, for otherwise there would be no ground upon which to base a finding that they might have existed.

In *Lincoln v. Tauton Copper Mfg. Co.*, 9 Allen (Mass.) 181, the issue was whether a copper mill was injuriously affecting plaintiff's land. The plaintiff had shown by experiment that vegetation on the premises had contained copper. Thereupon, the defendant was permitted to show by an expert that in experiments on grasses procured elsewhere he had obtained copper. *Eidt v. Cutter,* 127 Mass. 522, is a similar case. The same principle was applied in *Farmers'*

& *Merchants' Bank v. Young,* 36 Iowa, 44, where a witness
accounted for the apparent difference in color of ink in sig-
natures by saying that a blotting pad may have been used
on one and not the other, and it was held error not to allow
him to illustrate the effect of the writing pad, i. e., demon-
strate that the same result in colors might have been occa-
sioned by the use of the blotting pad as in the use of dif-
ferent inks.   In *Homan v. Franklin Co.,* 98 Iowa, 692, an
expert having testified that the dilated condition of plaintiff's
pupils was traceable to an abnormal condition of the heart,
and, having performed certain experiments so indicating in
the presence of the jury, the defendant, after showing by
other experts that the same results would be produced on
other persons, asked to be permitted to demonstrate this on
some person with normal eyes.   This was denied, as " the
court could not be asked to find a man in normal condition."
Though the ruling was sustained, it was on the ground that
there was no abuse of discretion in refusing to delay the
trial to obtain a suitable subject, but the admissibility of
such evidence was distinctly recognized.   Such evidence is
often of the greatest importance in aiding the jury to ascer-
tain the cause which produced a particular result when this
is purely a matter of inference.

The case at bar is a pertinent illustration of this.   No
one witnessed the death of Tackman.   The cause was purely
a matter of inference.   We are asked by the appellant to
infer from the fact that the deceased was found dead with
a strap about his neck that he voluntarily placed it there
for the purpose of killing himself.   This involves the fur-
ther inference that he tied the strap to his neck and threw
his weight on it.   Why not infer instead that the strap hung
over the peg in the form of a loop ?   It was the habit of
Tackman and his sons, in hanging the bridles, to throw the
strap over the peg.   Says Greenleaf, in his work on Evi-
dence (volume 1, section 14) :   " A habit of doing a thing
is naturally of probative value as indicating that on a par-

ticular occasion the thing was done as usual, and, if clearly shown as a definite course of action, is constantly admitted in evidence." *Smith v. Clark,* 12 Iowa, 32.   It might have been found, then, that the bridle had been hung at this place with a tie strap hung over the peg.   It might also have been found, from the testimony of Henry, that the strap when pulled from his father's neck was not tied.   This last circumstance strongly tends to support the presumption that death was by accident.   The only condition, then, necessarily to be inferred in support of the experiment, is that the tie strap might have hung over the peg in the form of a loop. This was quite as permissible in explanation of how the accident might have happened, as to infer that deceased voluntarily tied it about his neck.   It is also quite as permissible to suppose that he fell in this loop, as that he voluntarily sank down with his weight to strangle himself.   In other words, it is as logical to say the conditions were as supposed in the experiments of Olney, as that they must have been had he committed suicide.   Manifestly, then, the jury might have found the conditions as supposed in the experiments reasonably probable, and it was not error to receive the evidence as tending to explain how death was produced.

IV.   Exception is taken to the fourth instruction, in which the jury was told that:  " A man's natural instinct is to preserve his life, and not to destroy it.   Therefore the *4. INSTINCT OF SELF PRESERVATION: presumption.* presumption is that Tackman did not commit suicide, and that presumption should be considered in deciding whether or not he did commit suicide."   The appellant thinks that the instructions should have been qualified so as to limit this presumption to " natural conditions," and when the party is in possession of his faculties.   In the absence of any evidence to the contrary, the deceased was presumed to be in his right mind, and therefore the presumption stated by the court obtained. The criticism is disposed of by *Stephenson v. Bankers' Life Ass'n,* 108 Iowa, 637.— *Affirmed.*