KATHERINA MICHALEK, Appellant, v. MODERN BROTHERHOOD
OF AMERICA, Appellee.

**INSURANCE:** Life Insurance—Suicide—Presumption—Degree of
1 **Evidence to Overcome.** The strong presumption against death
from suicide furnishes *affirmative* evidence of death from natural
or accidental causes, and can be overcome only by evidence so
strong, clear, and persuasive as to exclude every reasonable hypothe-
sis of natural or accidental death. *And this is true even though
deceased came to his death from the discharge of a weapon admit-
tedly in his own hands.* Evidence reviewed, and held to present a
jury question on the issue of suicide.

**INSURANCE:** Life Insurance—Suicide—Burden of Proof. One seek-
2 ing to recover on a life insurance policy, and met with the
defense of death by suicide, need not set up or prove the truth
of any particular theory of the exact manner in which deceased
met his death. The burden is on the defendant by his evidence
*to eliminate every other reasonable theory of death otherwise than
by suicide.*

**INSURANCE:** Life Insurance—Suicide—Evidence—Admissions in
3 **Proofs of Death—Effect.** Statements in proofs of death that
deceased came to his death by suicide are an admission and
receivable against plaintiff, but create no estoppel, and are
subject to explanation.

**EVIDENCE:** Hearsay—Cause of Death—Opinion of Coroner. The
4 opinion of a coroner, expressed in a report to the State Board
of Health, to the effect that deceased came to his death from
suicide, is hearsay.

*Appeal from Cedar Rapids Superior Court.*—C. B. ROBBINS,
Judge.

SATURDAY, JANUARY 20, 1917.

ACTION at law to recover upon a certificate of life insur-
ance issued by the defendant association on the life of An-
thony Michalek. There was a directed verdict and judgment
for the defendant, and plaintiff appeals.—*Reversed.*

*Milo O. Hanzlik, Barnes, Chamberlain & Randall,* for appellant.

*Grimm & Trewin,* and *Sam Sparrow,* for appellee.

WEAVER, J.—That the defendant is a fraternal insurance or beneficiary association; that Anthony Michalek became a member thereof and received from the association a

1. INSURANCE: life insurance: suicide: presumption: degree of evidence to overcome.

benefit certificate payable to his wife, the plaintiff; that at the time of his death he was still a member in good standing; and that, except for the matters pleaded by way of an affirmative defense, the defendant would be liable in this action, there is no dispute. Stated briefly, the defense is that Michalek committed suicide and that, by the terms of the contract with the association, it was expressly exempted from liability for a death so caused. Nor is there any dispute on the part of the plaintiff that, in his application for membership, and in the benefit certificate issued to him as a member, Michalek agreed that, in the event of his death by suicide, whether sane or insane, no recovery of benefits or insurance could be had. The one question calling for our decision is whether a case was made upon which the plaintiff was entitled to have the verdict of a jury.

Upon familiar principles, the settled character of which we do not understand appellee to deny, the admitted fact that Michalek died while a member of the association in good standing is sufficient to show the plaintiff entitled to recover, in the absence of evidence tending to support the affirmative plea of suicide. If there be such evidence, then under all ordinary circumstances an issue is disclosed upon which either party is entitled to have the verdict of a jury. It is not to be denied, however, that a case may arise where the showing of suicide is so undisputed, clear and convincing that the court may find the truth of the plea established as a matter of law. *Inghram v. National Union,* 103 Iowa 395. Was the defense in this case thus conclusively proved?

Giving the evidence its most favorable construction for the plaintiff, as we are required to do where a verdict is directed for the defendant, the facts attending the death of Michalek, so far as known, are substantially as follows: Deceased was 52 years old, and for 25 years had been employed as head miller in the Quaker Oats Mill in Cedar Rapids. He was a married men, living with his wife and an unmarried son and daughter in a home of their own. On the same lot with their residence were a woodshed and closet; also a chicken house in a yard enclosed by woven wire fencing, where they kept poultry. On week days, it was his practice to leave for his work about 5:30 o'clock. On Sunday, he would usually get up about 6:30 o'clock, feed the poultry, shave, bathe and put on clean clothing. He owned a revolver, which he had brought from California several years before his death. On Saturday, July 4, 1914, the day before he was killed, he and his daughter had done some target shooting with the weapon. So far as appears, his domestic relations were pleasant, he was of a cheerful disposition, and at no times showed indications of melancholy or despondency. There is no showing that he was involved in business or financial difficulties. On Sunday, July 5th, he followed his usual practice, and, after feeding the poultry, shaving and bathing, he sat for a while on the porch, and, in reply to a question by his wife, said that the weather was too hot to go out. During the morning, he sent his daughter to a store near by to procure him a supply of tobacco. He divided this tobacco, putting part in the pocket of the suit he was wearing, and the rest in the pocket of his working suit. His wife says he "appeared to be feeling good," and was "pretty jolly," and neither said nor did anything out of the ordinary. She also testified that they had been troubled with rats, which infested the chicken house, and that Michalek had at times shot at them. About noon, he was seen to go in the direction of the chicken yard and woodshed. His wife heard a shot, and looking out saw the deceased standing upright, with his hand

extended in front, pointing toward the chicken house. Seeing this, her first thought was that he was shooting at rats. Then she saw him with his two hands drawn up in front of him, and with one hand whirling or twirling something. This, according to plaintiff's theory, tends to show that he was having trouble with the revolver, and was trying to adjust the cylinder. Very quickly two other shots followed, and she saw her husband stagger and fall. Alarm was at once raised, and the family and neighbors gathered at the scene of the tragedy. Michalek lived a few minutes, but he did not speak.

The mechanism of the revolver is mentioned by several witnesses, but it is not in all respects clear to the reader. It was an automatic, with a cylinder of five chambers. After the shooting, it was found to have three empty chambers and two chambers holding unexploded cartridges. The daughter swears that, when using the revolver on Saturday, she and her father had some trouble in operating it. She says, "We had some difficulty with the revolver that day." Her words are:

"I shot out of the revolver twice, and the third time I pulled the trigger, the revolver would not go off, and I handed it to father and he turned the cylinder and gave it back to me, and I shot it the other three times."

Another witness says that "the revolver in question,— when the trigger is back, it apparently sticks. The spring below the hammer which throws the trigger forward is apparently out of condition."

It is but fair, however, to say that this witness had, on an earlier occasion, found the mechanism in working condition, and he thinks something happened to it after his first inspection.

Another witness says:

"The revolver is out of order, but the safety device is not."

Still another witness, familiar with weapons of this kind, says:

"They get out of order occasionally. The cylinder could stick occasionally and operate all right at other times."

From the date of the shooting until the trial below, the weapon had been kept in the possession of the coroner. Nothing is proved tending to show the deceased to have been insane or intoxicated.

On the other hand, the theory of suicide is based upon the fact that the deceased had in his own hand the weapon which killed him; that, as is claimed, there were three gun shot wounds found in his breast; that it is highly improbable, under the circumstances, that three such wounds could have all been accidentally inflicted; and that the proofs of death filed with the company by or on behalf of the plaintiff admit that the death was by suicide.

That the last mentioned circumstance may be more clearly understood, we will state that, by the rules of the association, upon being notified of the death of a member, the chief secretary is required to send the secretary of the local lodge blank forms to be used in making formal proofs of death. The local secretary then delivers the blanks to the beneficiary. This procedure seems to have been followed. The local secretary, at the request of plaintiff, filled out the blank forms, and plaintiff executed them. Of the questions and answers, two only bear upon the point made by defendant, and are as follows:

"10. How long was deceased sick? Ans. In good health just prior to his death.

"11. Of what disease did he die? Ans. No disease, suicide."

Accompanying the affidavit of the plaintiff was another, in which questions were addressed to and answered by a physician. Of these, the following are in point:

"Q. State the immediate cause of death. A. Three gun shot wounds. Q. If from any cause other than disease,

state the medical and other facts connected therewith. A. Suicide. Q. Is there any reason to suspect suicide? A. Yes."

The custom or rule of the association appears also to have required the execution of a statement by the officers of the local lodge, supported by another affidavit of the beneficiary. In the present instance, this certificate recited the membership of the deceased in good standing at the time of his death, and that "the cause of his death was said to be suicide." Plaintiff's affidavit sets out the circumstances of the death, and concludes with the statement:

"In my opinion he committed suicide, although I know no reason why he should do it, as there was no trouble in the family or in financial matters."

As a witness on the trial, she says she did not tell the secretary that her husband committed suicide; that she did not read the paper after the blanks were filled, and did not understand them as affirming the fact of suicide, and further explains by saying:

"I said he did it by his own hand, but I did not mention suicide. That is, I meant nobody else done it."

Of the last mentioned statement, accompanying the certificate by the lodge officers, she says, if we understand the record, that the paper was brought to her prepared for her signature; and, while she admits she read it, she further says:

"I did not understand what I was reading. I can read part of it, but I cannot make anything out of it. I have not had sufficient schooling to read after a lawyer. I told Mr. O'Brien at that time that in my opinion he did not commit suicide."

We might also add that, while most of the witnesses who saw the dead body say that there were three wounds in the breast, yet not all are agreed. One witness for the defendant, a deputy sheriff, who was a near neighbor and one of the first on the ground after the shooting, says the first thing he did was to examine Michalek's body, and there were two

bullet wounds near the left nipple. On the repetition of the question, he answered, "All the wounds I saw were two." It being the theory of plaintiff's counsel that the first shot was fired with the deceased's hand extended toward the chicken house, in the attitude in which his wife first saw him, and that, there being something wrong with the action of the weapon, he brought it up in front of his breast to adjust the cylinder, when, through some unknown accidental cause, the other two shots were discharged, expert evidence was produced of the possibility that a single bullet or shot might account for two wounds. One surgeon of experience in army service and having made practical study of gun shot wounds says, in substance, that a bullet entering the body may be deflected by a bone in its course, or even by a muscle, and emerge from the body, thus making two surface wounds, and that the place of emergence, whether near or far from the entrance, depends on many factors, as, for example, the shape and weight of the bullet and the angle at which it strikes the deflecting obstacle. He also says that a bullet so fired into the body may split, on striking a rib or other bone, so that but one fragment may come out. There was also expert evidence having some tendency to show that the shock created by a sudden wounding may be followed or accompanied by an involuntary or spasmodic clenching of the hands, and from this it is argued that the last shot may have been caused by the involuntary grip of the pistol hand of the deceased. There was no coroner's inquest, no post mortem examination, nor any probing of the wounds. The coroner examined the body, and says he saw three wounds. He says he held no inquest, but reported the case to the State Board of Health.

Before passing upon the question whether this record makes out a case of suicide as a matter of law, let us look as briefly as practicable to the rules and principles by which we must be governed.

That the defense relied upon is an affirmative one, and

the burden of establishing it is upon the appellee, is so well settled that we will not take the time necessary for the citation of authorities. The burden thus assumed is something more than ordinarily rests upon a party who undertakes to establish an asserted fact over the bare denial of his adversary. In a case of the latter class, there is ordinarily no presumption for or against either party. Here, however, the defendant is met by a presumption against suicide or suicidal intent. That such is the general rule, all courts admit, but as to its effect and operation, there is some dissonance of opinion. Some have treated the presumption as of rather slight value and easily overcome (*Agen v. Metropolitan Life Ins. Co.*, 105 Wis. 217); but by far the greater number and the better reasoned cases unite in holding that the party charging suicide, where circumstantial evidence is relied upon to support the claim, can overcome the presumption against self-slaughter only by proof of facts which exclude every reasonable hypothesis of natural or accidental death. Such has repeatedly been our own holding. We have said, for example:

"This presumption has the effect of affirmative evidence, and, unless so negatived . . . as to leave room for no other reasonable hypothesis than that of suicide, such presumption will be allowed to prevail, and a verdict thereon will not be set aside for want of evidence." *Stephenson v. Bankers Life Assn.*, 108 Iowa 637, 641.

It has been elsewhere said:

"If the known facts are consistent with a cause of death which does not involve self-destruction, that cause must be accepted. After all the hypotheses which are consistent with an innocent or accidental death are eliminated, the conclusion of suicide may then be drawn. The burden is upon the defendant to show that the circumstances and conditions are inconsistent with any other reasonable cause of death than that of suicide; that is, it must eliminate and disprove all other causes of death which are consistent with the evidence

before the jury is justified in inferring that the deceased committed suicide.'' *Lindahl v. Supreme Court I. O. F.,* 100 Minn. 87 (110 N. W. 358).

See also *Metropolitan Life Ins. Co. v. DeVault,* 109 Va. 392, 402. Quite to the point, also, is the language of the Supreme Court of the United States, where, speaking by Brewer, J., it refused to disturb a verdict for a beneficiary, saying:

''Whether the deceased committed suicide was a question of fact, and a jury is the proper trier of such questions. It is not absolutely certain that the deceased committed suicide.'' *Pythias Knights' Supreme Lodge v. Beck,* 181 U. S. 49 (45 L. Ed. 741).

Says the Virginia court:

''We are of opinion that the defense of suicide should be established by clear and satisfactory proof, such as is required to establish a fraud.'' *Life Ins. Co. v. Hairston,* 108 Va. 832. *Walden v. Bankers Life Assn.,* 89 Neb. 546.

Even where, as in this case, there is direct evidence that the death was caused by a weapon in the hands of the deceased himself, the presumption still prevails; because, if nothing more than that is shown, there is still room for the hypothesis that his act in that regard may have been involuntary or accidental. *Paulsen v. Modern Woodmen of Am.,* 21 N. D. 235 (130 N. W. 231); *Industrial v. Watt,* 95 Ark. 456; *Walden v. Bankers Life Assn.,* 89 Neb. 546 (131 N. W. 962). This presumption has been held to prevail where it was certain that the pistol could not have been fired except by pulling the trigger, because it may have been pulled unintentionally or involuntarily. *Mutual Life Ins. Co. v. Ford* (Tex.), 130 S. W. 769 (131 S. W. 406).

Appellee's chief reliance in this case is, first, upon the physical fact displayed by the wounds upon the body of the deceased, and second, upon the statements or admissions by the plaintiff in her proofs of loss.

In our opinion, the number, location and appearance of

the wounds, and the certainty that the weapon which inflicted the wounds was held by the deceased himself are not, of themselves alone, such conclusive showing of suicide as makes the question one of law for the court. This is not saying that the facts mentioned have no tendency to prove suicide; for they do. It is, however, a fact against the effect of which the jury may properly consider and weigh the evidence that this man was of middle age, in good health, in good and responsible employment, in which he had served for 25 years; was the proprietor of a comfortable home; had wife and children, with whom he was living in harmony; was of a cheerful temperament; and was entangled in no financial difficulties or other complications, such as sometimes drive men to desperation, ending in self-destruction. It would also have been proper for the jury,—indeed, it would have been its duty,—to throw into the scale in plaintiff's favor the fact of universal knowledge and observation that sane men do not generally seek death, but rather are at all times solicitous to

2. INSURANCE: life insurance: suicide: burden of proof.
avoid it. In this connection is to be remembered another fact: that suicide by a sane man is an act of moral turpitude, if not a crime; and, if the facts surrounding death can be reconciled with any reasonable theory of an innocent or accidental cause, it is the duty of courts and jurors to adopt that explanation. *Walcott v. Metropolitan Life Ins. Co.*, 64 Vt. 221. The theory of the plaintiff that the first shot fired from the revolver was directed at a rat or some other object in the chicken yard; that, the revolver not operating satisfactorily, the deceased was holding it in front of him, attempting to adjust it, when the fatal bullet was unintentionally discharged,—was not so inconsistent with the evidence that the court could exclude it from the consideration of the jury. While, in cases where the fact of suicide is so glaring as to afford no possible grounds for dispute, the courts will not hesitate so to hold, yet they are quite infrequent, and especially so where, as

here, the conclusion is to be drawn in any material degree from evidence which is purely circumstantial.

In the case of *Leman v. Manhattan Life Ins. Co.*, 46 La. Ann. 1189, the deceased died of a gunshot wound. The discharged pistol was in his hand, the thumb thrust through the guard. The physicians called pronounced it a suicide, and the proof of loss sent to the company stated suicide as the cause of death. The trial court found for the defendant, but on appeal the judgment was reversed. The court there says:

"Giving all due effect to the expert testimony, it is at least fair to say it does not establish the suicide. In any consideration of the cause of the death weight is due to the condition of the deceased in life, i. e., his domestic relations, his means, his health and the state of his mind. It is human experience that the motive prompting self-destruction is to be sought, and usually found, in domestic unhappiness, ill health, financial troubles or insanity. . . . The deceased was fortunate in business, had a wife and children to whom he was attached, and with whom he was happy. He parted with them on the day of his death in the best of spirits, and the shock of his death came a few hours later. No physical malady or mental disturbance or financial trouble existed to furnish any cause for taking his life. In this condition of the record there is no adequate basis to refer the death to the intentional act of the deceased."

In a later case in the same court, the insured went into a room in his own home, whence a shot was soon heard. His family entered the room, and found him sitting in a chair, unconscious from a fatal gunshot wound. The gun was lying across the deceased's leg. It was one both father and son used for shooting rats. The lock was out of order. There was evidence tending to show that, on one or two other occasions, he had used language indicating a desire to die, or a purpose to commit suicide. Otherwise, there was nothing

in his family relations or business or social conditions which could be thought to give rise to such morbid intent. So far as his handling the gun bore upon the question, the court, in suggesting other tenable theories of his death, says:

"It may have been that he intended to use it for an entirely proper purpose. The freaks of a gun, when not carefully handled, are sometimes wonderful. We do not consider that the gun which the deceased had, from the description of it, was entirely safe even when prudently handled. The string spoken of as tied around the broken hammer is suggestive of danger when the gun was thoughtlessly taken up for any purpose. The theory of suicide is not the only one to be inferred from the testimony." *Boynton v. Equitable Life Assurance Soc.,* 105 La. 202 (52 L. R. A. 687).

See also *Kornig v. Western L. Ind. Co.,* 102 Minn. 31; *Cosmopolitan Life Ins. Co. v. Koegel,* 104 Va. 619, 633.

The attitude of this court with reference to the strength of the presumption against suicide is shown in the *Stephenson* case, from which we hereinbefore quoted. There, the insured had been confined in an asylum for the insane. He was permitted to go home, accompanied by a friend. He then obtained a revolver, with the avowed intention of shooting the sheriff, should that officer attempt to take him back to the asylum. Coming home with the weapon, instead of going into the house, he passed into the barn, and very quickly a shot was heard. His friends, going to the barn, found him on his back, his hand extended, grasping the revolver; and near the center of the forehead, a fatal bullet wound. There, as here, the company asserted it was a plain case of suicide; but we held that the question was one for the jury. *Tackman v. Brotherhood,* 132 Iowa 64, is another case where we held the presumption to be sufficient to take the issue to the jury, even though there was, admittedly, much evidence tending to support the theory of suicide. The same is true of the case of *Van Norman v. Modern Brotherhood,* 143 Iowa 536.

It must be remembered that, in order for plaintiff to recover under the issues and the admitted facts, she was not required to set up or prove the truth of any particular theory of the exact manner of Michalek's death.  To defeat her recovery, the defense was required to prove its theory of suicide, and this it cannot be said to have done, no matter how strong or persuasive the showing, unless it goes to the extent of eliminating every theory of death otherwise than by suicide.  We are satisfied that appellant did not succeed in making such conclusive showing.

The last inquiry for our consideration is the effect of the admissions or statements in plaintiff's proofs of loss concerning the cause of Michalek's death.  Counsel for appellee argue it somewhat as if the answers there made have the effect of an estoppel, precluding the plaintiff from insisting, upon the trial, that the death was due to any other cause than suicide.  The statement of the proposition in argument is that the introduction of the proofs in evidence made at least a prima-facie showing of suicide, and that the case so made for the defense "became conclusive when appellee failed to show that the statements in the proofs of death were made under a misapprehension of the facts or in ignorance of material matters subsequently ascertained." This claim involves a misapprehension of the record and of the law applicable to the situation.  The plaintiff did explain her part in the proofs of loss, by denying that she knew or understood that the statement and affidavit contained an allegation or admission that her husband committed suicide, and stating that what she said and what she intended to be understood as saying was that his death was the result of his own act, and not the act of anyone else, and that at no time did she intend to say that his death, though by his own act, was other than accidental.  The explanation was not so unreasonable that the jury may not properly have credited it. Indeed, even though she had attempted no explanation, her

3. INSURANCE: life insurance: suicide: evidence: admissions in proofs of death: effect.

statement in the proofs was not an estoppel; and, while it was admissible as in the nature of. an admission, it constituted but one circumstance among the many developed in the testimony, and it was for the jury to consider and give it such weight as they found it entitled to in reaching their verdict.    It is manifest, upon the admitted facts, that her statements in the proofs were, at the utmost, a mere opinion drawn from the circumstances as they appeared to her.    In the *Tackman* case, supra, we said that statements or admissions made by the wife under similar circumstances "were of little 'consequence," citing approvingly on this point *Supreme Tent v. Stensland* (Ill.), 68 N. E. 1098, where,. as in this case, the widow had signed proof of loss stating that the cause of death was suicide, and it was held to work no estoppel, and this was said to be true "even granting that she knew and comprehended at the time that the proof of death contained the statement that the death was from suicide, still no estoppel arises, for the reason that the statement . . . was a mere opinion."

Appellee quotes with some reliance language used by Field, J., in *Insurance Co. v. Newton*, 89 U. S. 32 (22 L. Ed. 793).    In the first quotation made, the court was not speaking of any admission made by the plaintiff, but of an admission by the company, which the plaintiff claimed was made in acknowledging the receipt of the proofs of loss.    The other language referred to—that the proofs were intended for the action of the company and the company could rightfully rely thereon as true, and that, "unless corrected for mistake, the insured was bound by them,"—is perhaps, standing alone, and without the aid of light from a multitude of other precedents, capable of the construction put upon it by counsel. But the official headnote to the decision, prepared by Justice Field himself, shows his own construction of the decision to be simply that the proofs are "admissible as prima-facie evidence of the facts stated therein, against the insured."    Since that decision was made, the same court has had repeated occa-

sion to consider the same proposition. In *Home Benefit Assn. v. Sargent*, 142 U. S. 691 (35 L. Ed. 1160), the death of the insured was attended by many circumstances tending far more strongly than anything found in this record to show death by suicide, and the proofs of death, though somewhat ambiguous, indicated plaintiff's admission of that fact; yet the court held that defendant was not entitled to a directed verdict, saying:

"It is contended for the defendant that, because of the contents of the proofs of death, the plaintiff is estopped from claiming that Hall's death was caused otherwise than by suicide, and that, at least, the court should have held that the burden originally upon the defendant was shifted, by the introduction of the proofs of death, to the plaintiff, and it became her duty to satisfy the jury, by a preponderance of evidence that Hall died otherwise than by his own hand. But the defendant was not prejudiced by the statements and opinions in the proofs of death, and the plaintiff was not estopped thereby, as a matter of law."

In *Aetna Life Ins. Co. v. Ward*, 140 U. S. 76 (35 L. Ed. 371), the defense was that the policy had been forfeited by the intemperate habits of the insured, and the physician's certificate of death furnished to the company fairly showed the fact; but the court sustained an instruction to the jury that "this certificate is not to be taken . . . by you as conclusive evidence of the facts therein stated, nor is the plaintiff bound by this statement or estopped from proving to your satisfaction a different cause of death."

In *Supreme Lodge v. Beck*, 181 U. S. 49 (45 L. Ed. 741), the defense, as here, was suicide of the insured, and there the plaintiff in her proofs had answered the question as to cause of death by the single and unqualified word, "Suicide." Much of the evidence on the trial strongly tended to establish such fact. The trial court, refusing to direct a verdict for the defendant, told the jury that the plaintiff's statements in the proofs of loss did not estop her; that she could

explain the circumstances under which she had signed it; and that, while standing alone, it would justify a verdict for defendant, yet, if explained, and the jury were satisfied that the death did not arise from suicide, she was not concluded by the declaration. This charge was held not to be erroneous, the court stating as its own opinion: "None of the elements of estoppel enter into the declaration." Other cases to the same effect are very numerous. See, for example, *Scott v. Homesteaders,* 149 Iowa 541; *Scott v. Sovereign Camp of Woodmen,* 149 Iowa 562; *Beckett v. Northwestern Mas. Aid Assn.* (Minn.), 69 N. W. 921; *John Hancock M. L. Ins. Co. v. Dick,* 117 Mich. 518; *McMaster v. President, etc., of Ins. Co.,* 55 N. Y. 222; *Birmingham Fire Ins. Co. v. Pulver,* 126 Ill. 329, 335; *Spencer v. Citizens' Mut. L. Assn.,* 142 N. Y. 505; *Redmond v. Industrial Ben. Assn.,* 150 N. Y. 167; *Cluff v. Mutual Ben. L. Ins. Co.,* 99 Mass. 317; *Lebanon Mut. Ins. Co. v. Kepler,* 106 Pa. St. 28, 34; *Boyd v. Royal Ins. Co.,* 111 N. C. 372, 377; *Hanna v. Connecticut Mut. L. Ins. Co.,* 150 N. Y. 526, 530; *Bankers Life Assn. v. Lisco,* 47 Neb. 340; *Mutual Life Ins. Co. v. Stibbe,* 46 Md. 302, 312; *Christy v. American T. L. Ins. Assn.,* 123 N. Y. S. 740; *Mutual Life Ins. Co. v. Durden* (Ga.), 72 S. E. 295; *Hogan v. Metropolitan Life Ins. Co.,* 164 Mass. 448; *Abraham v. Mutual Res. Fund L. Assn.,* 183 Mass. 116.

Something has been said in argument of the effect of the statement by the coroner of his opinion concerning the death of the deceased, and of the report of that officer made to the State Board of Health. This court has sustained the admissibility in such cases of the verdict of a coroner's jury—an extreme holding to the propriety of which the writer does not assent; but it has never yet taken the step beyond that limit which is required to give admissibility in evidence of such officer's opinion or of his report of such opinion to an administrative board or commission having no interest therein or official duty in connection with the death of the deceased except as

4. EVIDENCE: hearsay: cause of death: opinion of coroner.

an item in the compilation of a table of vital statistics.  In this case there was no inquest, no coroner's jury and no pretense of a verdict of such a body.  The coroner's opinion, from a mere view of a dead body upon which he holds no inquest, is entitled to the same weight and consideration which should be given to that of any other intelligent citizen having the same opportunity to know the truth,—no more and no less; and the facts and contents of his report to the State Board of Health are clearly hearsay.

The burden of proof in this case never passed or shifted from the defendant to the plaintiff.  If plaintiff had rested her case in chief on the bare showing or concession that Michalek was dead and died insured by the policy in suit, and the defendant had responded by identifying and putting in evidence the plaintiff's admissions in the proofs of loss and its other evidence, if any, pointing to suicide, and plaintiff had offered no rebuttal, the question would then have fairly presented itself whether there was any issue of fact for the jury.  With the evidence in that condition, we may, for the purposes of this case, admit that the burden, not of proof, but of going ahead with other evidence, if any she had, was then upon the plaintiff.  This view she accepted, and did proceed to strengthen the ordinary presumption against suicide by proof of many circumstances which are universally admitted as tending to negative suicidal purpose or intent, and still other evidence to explain and rebut the admissions found in the proofs of loss, and to support the view that, upon the record as a whole, suicide is not shown by that clear degree of certainty which is necessary to exclude every reasonable theory of accidental death.

Can the court assume to say that all this evidence and all these circumstances developed on the part of plaintiff in rebuttal of the defendant's affirmative defense are of no value, and the jury shall not be permitted to consider them?  We think not; and, of the innumerable insurance cases found

in our books, the precedents which justify a contrary holding are very few, and do not command the general assent of the courts or profession in general. The trial judge may, for example, disbelieve the plaintiff's statements with reference to her understanding at the time she signed the proofs of loss; but her truthfulness was a question for the jury alone. So, too, he may have disbelieved the testimony as to the disordered condition of the revolver, or as to what the wife saw when she heard the first shot, as to any of the several other matters brought out in her behalf, or he may have thought them of slight weight or importance; but it was for the jury to pass its judgment, not only upon each of these several items of evidence, but, as well, upon the whole array of facts and circumstances as a composite whole.

The foregoing sufficiently indicates our views upon the legal propositions presented by counsel. They manifestly require a reversal of the judgment below, and the cause will be remanded for a new trial in harmony with the views herein expressed.—*Reversed.*

GAYNOR, C. J., EVANS and PRESTON, JJ., concur.