**RYAN ET AL, Plaintiffs-Appellants, v. INDUSTRIAL COMM., Defendant-Appellee.**

Ohio Appeals, Eighth District, Cuyahoga County.

No. 20435. Decided December 16, 1946.

Cerrezin & Wilson, Cleveland, for Plaintiffs-Appellants.

Hugh S. Jenkins, Atty. General, Columbus, C. H. Bernard, Cleveland, for Defendant-Appellee.

## OPINION

By SKEEL, PJ.:

Albert Ryan, the plaintiff's decedent, was, on the 9th day of January, 1941, an employee of the Cleveland Clinic Foundation, a contributor to the Insurance Fund administered by the defendant. He was a stationary engineer. The boiler room of the Foundation where Ryan was employed was equipped with two large boilers over which was constructed a cat walk to be used to make necessary repairs and to regulate certain valves connected with the power equipment. The cat walk which was forty feet above the floor of the boiler room could be reached from a stairway which extended up from the floor. During the afternoon of January 9, 1944, Albert Ryan while acting in the course of his employment went up the stairway to and upon the cat walk. After reaching the cat walk he fell to the concrete floor of the boiler room and was fatally injured. The only evidence as to the circumstances of the fall which caused his death was given by Mr. Theodore Schmitt, the fireman who worked with the deceased. After telling about the deceased going for coffee at about five o'clock P. M. and both the witness and deceased having two or three cups of coffee, the witness testified as follows:

"Q. After he finished the coffee, where did he go, if you know?

A. Well, I don't know if he finished his cup of coffee, but I seen him walk out toward the door; he didn't walk fast.

Q. The usual way?

A. Yes, he walked up that catwalk and I started watching him go up and he went up half way and I paid no attention to him.

Q. What was the next thing that you saw after that?

A. He was coming through the air.

Q. How far from you was he coming through the air?

A. Oh, I would say— —

Q. In reference with us here in this room?

A. I am trying to judge here to see. You mean where he was when I saw him?

Q. About how far was he from you when you saw him coming through the air?

A. Well, I would say he was, oh, about twenty feet. You see it is on an angle here.

Q. How far was it from the top where he was when you first saw him coming through the air?

A. Oh, I imagine it is three squares to the boiler; there is that first square on top where I saw him; that is about half the length of the boiler there, a little over half to three-quarters of the way it is."

* * *

"Q. Will you kindly tell us just how far was he in the air from the bottom, the concrete floor, when you first saw him coming down?

A. Coming down?

Q. Yes.

A. Well, off hand I would say twenty—twenty-two feet.

Q. How far was he up the catwalk which leads up to the top of the boiler when you last saw him?

A. About fifteen I should say.

Q. Is that fifteen feet from the concrete floor?

A. Yes:

Q. You didn't see him on top of the catwalk?

A. No, I didn't.

Q. Now, when you saw him coming through the air, can you describe him to us, in which position his body was; was he coming down flat or how?

A. I was at an angle there; all I hollered was 'hey' and run down the engine room.

Q. Can you state whether he was perpendicular or flat?

A. Curled up or something, I couldn't say exactly how he was.

Q. Did you see him strike the concrete on the floor?

A. No, I was started by then.

Q. What did you do then, go down to him immediately?

A. Oh, yes.

Q. What did you do?

A. Lifted his head up, felt his head. He was conscious. I asked him where he was hurt. He told me, where he was

hurt. I asked him a few things; what is wrong and I thought —and I called a doctor.

Q. How far did you have to go to call a doctor?

A. Just reach out my hand; there is a phone on the wall."

There is no evidence in the record which discloses the deceased's purpose in going upon the catwalk at the time of the accident nor is there any evidence as to how or under what circumstances he fell to the floor below except that of Theodore Schmitt the fellow-employee of deceased who upon cross-examination testified as follows:

"Q. When he was on the floor, laying on the floor, you called the doctor didn't you?

A. Yes, I did.

Q. And Dr. Morgan came immediately to the room?

A. I believe that was his name.

Q. When Dr. Morgan was there, in your presence, was there any discussion; did the doctor ask him anything, or say anything to him?

\* \* \* \*

A. Yes, the doctor—you want what question the doctor asked me too?

Q. No, just the conversation that took place.

\* \* \* \* \*

Q. You may answer whether there was any conversation. THE REFEREE: Yes, answer 'yes' or 'no.'

A. Yes.

Q. Will you relate to us just what the conversation between Dr. Morgan and Mr. Ryan and yourself?

\* \* \* \* \*

A. Well, he asked me first what happened. THE REFEREE: Who asked you?

Q. Who asked you first?

A. Dr. Morgan, and I said, 'he fell;' 'he must have fell' and he asked me, 'from where?' I said, 'I guess from up there, the top of the boiler' and then he turned his attention to Al and he asked Al what happened, and Al said, 'I jumped'. He said 'where are you hurt?' and he said his pelvis, and the doctor said, 'we can't move him like this' and I believe I called the hospital to have a stretcher sent over.

MR. CERREZIN: I move to strike the answer.

REFEREE: Overruled.

MR. CERREZIN: Exception."

It is the claim of the appellant that there is sufficient evidence in the record to require the court to submit to the jury the question of whether or not the deceased came to his death as a result of an injury (not purposely inflicted) sustained while acting in the course and scope of his employment.

Before considering this principal claim of error we will dispose of the question of whether or not the objection of the appellant to the admission of the alleged statement of the deceased to Dr. Morgan that "I jumped" made in the presence of his fellow-employee, Schmitt, was properly overruled.

The appellant's objection was founded on the claim that the statement of the deceased was made to his doctor during the course of treatment and therefore was privileged. This contention cannot be supported. The words were spoken in the presence of another person. The witness testified to what he heard the deceased tell his doctor. Under such circumstances if what was said is otherwise admissible it cannot be objected to on the ground of privilege.

In **42 O. Jur., page 241, parag. 237,** the rule is stated as follows:

"It is generally held that where a privileged communication is overheard, whether by accident or design, by some person not a member of the privileged relation, nor a necessary intermediary such person may testify as to the communication being absolutely unaffected by the law of privilege."

Coming now to the question of whether or not it was prejudicial error for the court to direct a verdict for the defendant at the conclusion of plaintiff's case.

It is clear from the undisputed facts that at the time the deceased fell from the catwalk he was in a place where, as stationary engineer, he was on occasion required to be in carrying out his duties and that at the time the accident occurred he was, in fact, on duty.

It has long been the established rule in Ohio in Industrial Commission cases that where an employee whose duties are attended with certain hazards is found fatally injured while acting in the course and scope of his employment, in the place of his employment during a time when he is on duty, and the circumstances under which he was injured was not witnessed by another, there is a presumption that he was injured while acting in the course and scope of his employment.

In the case of **Roschen v Hoose, 40 Oh Ap 25,** the deceased was employed by an employer who had not contributed to the insurance fund administered by the Industrial Commission as

provided by law. At the time the accident happened that caused his death he was engaged in loading some baled paper and was standing on a row of bales about eight feet from the ground. While in that position he fell and as a result died very shortly thereafter. The trial court in reversing the ruling of the Industrial Commission for the employer and holding that the employee's legal representatives were entitled to participation in the fund, said in part as disclosed by the opinion of the Court of Appeals.

" * * * The court does not find that there is any credible evidence in the record as to what caused the fall. There is some evidence introduced by defendants to the effect that prior to the date of the accident John Coleman may have had some heart trouble, but there is nothing in the record on which the court could base a finding that his fall was occasioned by heart trouble. The court finds that the condition of John Coleman's employment required him to assume a position standing on bales of paper with his feet eight feet from the ground and that from the nature of the bales and the eight feet from the floor his employment occasioned certain necessary hazards; that the work done was of such a nature as to be a possible contributing factor in causing a failure of his heart action, if that condition was found to exist."

The trial court found for the plaintiff and the court of appeals affirmed the judgment. In commenting on the case in 42 O. Jur. 661, parag. 72, the author says:

"And compensation has been allowed for injury resulting from a fall from an elevated position although there is no evidence to show the cause of the fall."

In the case of **Mitchell v. Industrial Commission, 135 Oh St 111,** plaintiff's decedent was a night watchman. His duties required him to carry a revolver, lantern and keys. He was found on the premises of his employer during the hours he was employed to be on duty, with a bullet wound over the right temple from the effect of which he died. His revolver, with one discharged bullet, was found under his body. His lantern and keys were found some distance from him. He had told his employer a few days before that some one had tried to break in and that he had shot out the window. There was conflict in the evidence as to whether there were powder burns around the wound. There was evidence of considerable con-

fusion at the place where the body was found, although all the doors and windows of the building were locked. The Supreme Court, in affirming the trial court's judgment allowing the dependents of deceased to participate in the fund, said at pages 114-115 of the opinion:

"Other courts have adopted the view that the presumption against suicide is in the nature of evidence to be submitted to and weighed by the jury in connection with the other evidence, in determining the issue of suicide, 103 A. L. R. 191. In Provident Life & Acc. Ins. Co. v Pieto (1935) 169 Tennessee 124, 83 S. W. (2d) 251, the court stated:
"Where a death by external and violent means is shown, and there is no proof as to how it was caused, or the attendant circumstances leave the question doubtful, or the proof concerning them is conflicting or not inconsistent with accident, the law presumes an accidental death, and the burden of proof, in its secondary sense, is cast on the defendant and requires it to prove by a fair preponderance (sic) of the evidence that death was caused by suicide.'
"This presumption is not displaced by proof of circumstances which merely tend in a greater or less degree to show suicide, but in such case it is a question for the jury whether they overturn the presumption.
"Where there is no proof indicating either accident or suicide in case of death by external violence, or where the proof is equally balanced, or is conflicting, this presumption comes to the aid of the plaintiff in making out his or her case."

\* \* \* \* \* \* \*

"In Tackman v Brotherhood of American Yeoman (1906) 132 Iowa 64, 106 N. W. 350, 8 L. R. A. (N. S.) 974, the court stated that:
" 'The instinct of self-preservation and love of life is so pervading an element of human nature that the presumption always obtains against self-destruction and this presumption is to be treated as evidence in the case.'
"In the instant case the evidence before the court showed that the instrument with which the decedent came to his death had been furnished by his employer. It was used by him as a night watchman. There was some evidence of disorder and confusion. There was no motive for suicide shown. Mitchell was found in the building which he was required to watch. With such evidence pointing in the direction of accidental death, an issue for the jury was presented in the in-

stant case. There was other evidence strongly indicating suicide—the fact that the doors of the building were all locked, that there were four loaded cartridges in the revolver, and one empty shell, that the bullet causing the fatal wound came from the same revolver, that the bullet traveled in an almost horizontal position, and that Mitchell's body was almost under a wash-stand where there was a mirror. All of these circumstances, while possessing considerable probative force, nevertheless were not of such a convincing character as to warrant the court taking the issue from the jury."

There is evidence in the record that the deceased was in good health and his family relationship was happy and no circumstance was even suggested that would in the slightest degree motivate self-destruction. The court was in error, therefore, in holding that as a matter of law the record failed to show that the death of the deceased was the direct result of an injury sustained as a result of and while acting within the scope of his employment. A jury question was clearly presented by the record.

For the foregoing reasons the judgment of the common pleas court is reversed and the cause is remanded for further proceedings according to law.

HURD, J, and MORGAN, J, concur.